RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 14a0119p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

─────────────────

WILLIAM EASTHAM and FROSTIE EASTHAM,

              *Plaintiffs-Appellants,*

    *v.*

CHESAPEAKE APPALACHIA, L.L.C.,

              *Defendant-Appellee.*

No. 13-4233

─────────────────

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:12-cv-00615—Gregory L. Frost, District Judge.

Argued: May 1, 2014

Decided and Filed: June 6, 2014

Before: GUY, GIBBONS, and GRIFFIN, Circuit Judges.

─────────────────

**COUNSEL**

**ARGUED:** Carl A. Frankovitch, FRANKOVITCH, ANETAKIS, COLANTONIO & SIMON, Weirton, West Virginia, for Appellants. James C. Martin, REED SMITH LLP, Pittsburgh, Pennsylvania, for Appellee. **ON BRIEF:** Carl A. Frankovitch, Kevin M. Pearl, M. Eric Frankovitch, FRANKOVITCH, ANETAKIS, COLANTONIO & SIMON, Weirton, West Virginia, for Appellants. Kevin C. Abbott, REED SMITH LLP, Pittsburgh, Pennsylvania, for Appellee.

─────────────────

**OPINION**

─────────────────

GRIFFIN, Circuit Judge. In this diversity action, plaintiffs William and Frostie Eastham appeal the district court's grant of summary judgment in favor of defendant Chesapeake Appalachia, L.L.C. We affirm.

1

I.

The facts of this case are straightforward.  On April 9, 2007, the Easthams entered into a lease with Great Lakes Energy Partners, LLC (Great Lakes), the predecessor-in-interest to Chesapeake.  The lease granted Great Lakes the right to extract oil and gas from the Easthams' real estate, which consisted of 49.066 acres located in Jefferson County, Ohio.  After the lease was signed, Chesapeake acquired the lease.  In exchange for their oil and gas rights, the Easthams were granted a royalty of one-eighth of the oil and gas produced from the premises.  The lease also specified that, until a well was "commenced on the premises," the Easthams were entitled to "delay rental" payments of $10 per acre "to be made annually until the commencement of a well."  William testified that he received those payments (about $490) annually.  The lease term was five years.

> This appeal concerns the second sentence of Paragraph 19 of the lease, which states:
>
> In consideration of the acceptance of this lease by the Lessee, the Lessor agrees for himself and his heirs, successors and assigns, that no other lease for the minerals covered by this lease shall be granted by the Lessor during the term of this lease or any extension or renewal thereof granted to the Lessee herein. ***Upon the expiration of this lease and within sixty (60) days thereinafter, Lessor grants to Lessee an option to extend or renew under similar terms a like lease***.

(Emphasis added.)

On March 14, 2012, Chesapeake filed a notice of extension of the oil and gas lease with the Jefferson County Recorder.  Upon filing the notice of extension, Chesapeake sent the Easthams a letter stating that it had extended the lease on the same terms for an additional five years.  The letter enclosed a delay rental payment for $490.66.

At their depositions, the Easthams testified regarding their understanding of the lease terms.  In his deposition, William stated that Henry McGraw—defendant's leasing agent whom William previously knew—told him that the lease would be renegotiated after the initial five-year term.  William also testified that, before filing the notice of extension, Chesapeake did not attempt to renegotiate the terms of the lease or make any attempt at all to communicate with the Easthams.  William added that he "has a hard time reading" and accordingly did not read the lease.  However, William conceded that he could have had someone read the contract to him

before he signed it, but he did not do so.  In addition, William testified that he did not feel pressured to sign the contract.  Frostie also testified that she did not read the lease before signing it.  She also stated that she was not pressured into signing the lease, and signed it because William advised her that it was a "good idea" to do so; Frostie described the $10 per acre rental payment as "a good deal at the time."

On June 12, 2012, the Easthams filed a class action suit in Ohio state court in Jefferson County.  The complaint sought a declaration that Paragraph 19 of the oil and gas lease expired at the end of the five-year term and that title to the oil and gas underneath the real estate should be quieted in the Easthams' favor.  Specifically, the Easthams alleged that Paragraph 19 does not give Chesapeake the option to unilaterally extend the lease, but rather requires that the parties renegotiate the lease at the end of the initial five-year term.  On July 11, 2012, Chesapeake removed the case to the federal district court based on diversity jurisdiction.

On April 25, 2013, Chesapeake filed a motion for summary judgment asserting that the plain text of Paragraph 19 gave it the option to unilaterally extend the lease and that the Easthams' interpretation of Paragraph 19—that the term of the lease expired at the end of the five-year term and any renewal required a renegotiation by the parties—was unsupported.  The Easthams filed a cross-motion for summary judgment, arguing:  (1) under Ohio law, oil and gas leases must be construed against the lessee; (2) the plain language of Paragraph 19 required Chesapeake to negotiate a new "like lease" with "similar terms," and accordingly Chesapeake could not unilaterally extend the existing lease under its old terms; (3) in the alternative, Paragraph 19 is ambiguous and therefore the court could examine extrinsic evidence of the parties' intent, which favored the Easthams; and (4) Chesapeake's interpretation of Paragraph 19 created an unconscionable result and was void as against public policy.

The district court agreed with Chesapeake, granting summary judgment in its favor and denying summary judgment to the Easthams, concluding that under the plain language of the lease, Paragraph 19 gave Chesapeake two options:  either to extend the lease under its existing terms or renegotiate under new terms.  The Easthams timely appealed.

II.

We review de novo a district court's grant of summary judgment. *Parsons v. City of Pontiac,* 533 F.3d 492, 499 (6th Cir. 2008). Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When determining whether the movant has met this burden, we view the evidence in the light most favorable to the nonmoving party. *Smith Wholesale Co. v. R.J. Reynolds Tobacco Co.,* 477 F.3d 854, 861 (6th Cir. 2007).

III.

A.

On appeal, the Easthams repeat their principal argument from the district court that Paragraph 19 is ambiguous. We disagree.

Under Ohio law, "[w]hen confronted with an issue of contract interpretation, [a court's] role is to give effect to the intent of the parties." *Sunoco, Inc. (R & M) v. Toledo Edison Co.,* 953 N.E.2d 285, 292 (Ohio 2011). To that end, courts should

> examine the contract as a whole and presume that the intent of the parties is reflected in the language of the contract. In addition, [courts should] look to the plain and ordinary meaning of the language used in the contract unless another meaning is clearly apparent from the contents of the agreement. When the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties.

*Id.* Courts may examine extrinsic evidence to ascertain the parties' intent only if the contract is ambiguous. *Shifrin v. Forest City Enters.,* 597 N.E.2d 499, 501 (Ohio 1992).

A contract is ambiguous where it cannot be given a "definite legal meaning." *Westfield Ins. Co. v. Galatis,* 797 N.E.2d 1256, 1261 (Ohio 2003). Put another way, "[a]mbiguity exists only when a provision at issue is susceptible of more than one reasonable interpretation." *Lager v. Miller-Gonzales,* 896 N.E.2d 666, 669 (Ohio 2008); *see also* 11 Williston on Contracts § 30:5 (4th ed.). However, as the Ohio Supreme Court has cautioned, "[o]nly when a definitive meaning proves elusive should rules for construing ambiguous language be employed.

Otherwise, allegations of ambiguity become self-fulfilling." *State v. Porterfield*, 829 N.E.2d 690, 692–93 (Ohio 2005).

The Easthams argue that the phrase "extend or renew under similar terms a like lease" in Paragraph 19 is ambiguous because it is reasonably susceptible to more than one interpretation. Specifically, the Easthams assert that there is another reasonable construction of Paragraph 19 in addition to that of the district court:  namely, that Paragraph 19 "provides an option to the Lessee to enter into a 'like lease' 'under similar terms'" and "[s]ince the terms of any extension or renewal entered into pursuant to the option were deliberately left open by the use of the terms 'similar' and 'like,' Paragraph 19 required the parties to enter into a new agreement based on terms and conditions acceptable to both parties."  The Easthams argue that the phrase "under similar terms" can reasonably be understood to modify both the terms "extend" and "renew"; accordingly, the Easthams conclude that "it is completely reasonable to interpret Paragraph 19 to provide an option to 'extend under similar terms a like lease' or to 'renew under similar terms a like lease.'"  We disagree with the Easthams' interpretation of the contract.  For the following reasons, we conclude that the only reasonable construction of Paragraph 19 is the one accepted by the district court—that Paragraph 19 gives defendant two options:  (1) to extend the lease on the same terms as the existing lease; or (2) to renegotiate for a "renew[ed]" "like lease" on "similar terms."

First, the Easthams' ambiguity argument turns on an assumption that options to "extend" are synonymous with options to "renew."  Under Ohio law, they are not.  In *State ex rel. Preston v. Ferguson*, 166 N.E.2d 365, 371 (Ohio 1960), the Ohio Supreme Court specifically held that:

> [A] distinction must be made between contracts containing options to 'renew' for a given term or terms and those containing options to 'extend' for a given term. A contract containing an option to renew has the effect of granting a right to execute a *new* contract upon exercise of the option and the new contract is operative immediately after the terminal date of the original agreement . . . . On the other hand, a contract which may be characterized as one containing an option to extend an agreement constitutes a present grant which, upon exercise of the option, operates to extend the term of the original agreement and the contract then becomes one for both the original and the extended term.

Indeed, in Ohio, when a party exercises an option to "extend," it simply lengthens the existing agreement for a new period of time.  Accordingly, and contrary to the Easthams' argument, when

Chesapeake exercised its option to extend the lease, it bound the Easthams to the same agreement to which they were previously bound, but for a new period of years.

The Easthams rely on a recent Ohio trial court case, *Flannery, et al., v. Enervest Operating, LLC, et al.*, C.P. No. 12 CVH 27524 (Carroll Cnty. Common Pleas, April 14, 2014). In that case, the state trial court interpreted contract language identical to Paragraph 19 and concluded that there is "no meaningful distinction between an option to extend and an option to renew" a lease. *Id.* at 5. However, we are required to follow *Ferguson*, not *Flannery*. *Ferguson* is an opinion from the Ohio Supreme Court, and, in general, "only the law as expressed by the highest court of a State is binding on this Court in a diversity action." *Ruth v. Bituminous Cas. Corp.*, 427 F.2d 290, 292 (6th Cir. 1970).[1] Moreover, the rule from *Ferguson* has been reaffirmed repeatedly by both Ohio courts and by federal courts interpreting Ohio law. *See, e.g., Xenia v. State*, 746 N.E.2d 666, 673 (Ohio Ct. App. 2000) ("Paragraph 12 set forth an option to extend, rather than an option to renew, the water contract. Therefore, under *Ferguson,* no new water contracts ever came into being, but the original water contract remained continuously in force through a series of successive one-year extensions."); *Estate of Kinsey v. Janes*, 613 N.E.2d 686, 689–90 (Ohio Ct. App. 1992) (relying on *Ferguson* when holding that an option to renew created a series of new contracts); *Action Grp. Int'l, LLC v. AboutGolf, Ltd.*, 2011 WL 1627943 at *4 n.1 (N.D. Ohio Apr. 29, 2011) (citing *Ferguson* while noting that Ohio law "distinguishes between renewal contracts and contract extensions"); *In re Nat'l Century Fin. Enters.*, 312 B.R. 344, 348 (Bankr. S.D. Ohio 2004). *See also* 17B C.J.S. Contracts § 662 ("Generally, an option to renew a contract is the right to require the execution of a new contract while an option to extend the term merely operates to extend the term of the original agreement."). *See also id.* (collecting cases from multiple jurisdictions). In light of the fact that the Ohio Supreme Court and other state and federal courts interpreting Ohio law have held that

---

[1]An additional Ohio Supreme Court case, *Corvington v. Heppert*, 103 N.E.2d 558 (Ohio 1952), warrants discussion. In the district court, the Easthams relied on *Corvington* for the proposition that, under Ohio law, options to extend were synonymous with options to renew. On appeal, however, the Easthams have apparently abandoned their reliance on *Corvington* for this reason, instead relying on *Corvington* for the proposition that, even if mistaken, their interpretation of Paragraph 19 was reasonable. However, *Corvington* did not hold that options to "renew" and "extend" are synonymous as a matter of law. Rather, *Corvington* was fact-specific, holding that, under the facts of that case, the terms "extend" and "renew" had the same legal effect—i.e., continuation of the lease. *See id.* at 560 (noting that the court need not make a distinction between "extend" and "renew" "where their meaning is not defined or explained"). And, in any case, in *Ferguson*, which came eight years after *Corvington*, the court clarified that options to "extend" and "renew" are legally different under Ohio law. *Ferguson*, 166 N.E.2d at 371.

options to extend are legally distinct from options to renew, we are required to affirm the district court.

Second, the plain language of the lease agreement indicates that Paragraph 19 is unambiguous. Again, the viability of the Easthams' construction of Paragraph 19 requires the assumption that the terms "extend" and "renew" mean the same thing. *See* Plaintiffs' Br. at 27–28 ("[I]t is reasonable for one to read Paragraph 19 and understand the phrase 'an option extend or renew' [sic] to provide a single option because the terms 'extend' and 'renew' are so often used interchangeably."). Contrary to the Easthams' argument, however, these words have different meanings. The dictionary defines "extend" as "to increase the length or duration of; lengthen; prolong." Random House Webster's Unabridged Dictionary at 684 (Deluxe Ed. 2001). The dictionary defines "renew" as "to begin or take up again." *Id*. at 1631. *See also Campus Bus Serv. v. Zaino*, 786 N.E.2d 889, 891 (Ohio 2003) ("To determine the common, everyday meaning of a word, [the Ohio Supreme Court has] consistently used dictionary definitions." (citation, quotation marks, and alterations omitted)). Indeed, the plain meaning of the words "extend" and "renew" indicate that if defendant chose to "extend" the lease, it would simply be opting "to increase the length or duration of" the same lease, whereas if defendant chose to "renew" the lease, it would be opting to "begin or take up again" "a like lease [*i.e*. a new lease] . . . under similar terms." Moreover, the Easthams' construction—that "extend" and "renew" are synonymous terms—would produce a nonsensical result, as the contract would be redundant.**2** Under Ohio law, "a contract must be construed in its entirety and in a manner that does not leave any phrase meaningless or surplusage." *Local Mktg. Corp. v. Prudential Ins. Co.,* 824 N.E.2d 122, 125 (Ohio Ct. App. 2004). Accordingly, under the plain text of the contract, Paragraph 19 is unambiguous—the district court's construction of Paragraph 19 is the only reasonable one, and its rationale must be affirmed.

Third, construing Paragraph 19 consistent with *Ferguson* and the contract's plain language would give effect to each provision of Paragraph 19, consistent with Ohio law. Contrary to the Easthams' arguments, construing Paragraph 19 in this way would not render the

---

**2**Indeed, if "renew" and "extend" mean the same thing, then Paragraph 19 would give defendant the option to "extend or extend under similar terms a like lease" or "renew or renew under similar terms a like lease."

phrase "renew under similar terms a like lease" surplusage. Although a party always has the option to attempt to renegotiate new contract terms, through the phrase "renew under similar terms a like lease" Chesapeake here reserved the right to unilaterally bind the Easthams to a new agreement "under similar terms" to the preceding agreement for a new length of time. Indeed, the ability of one party to bind the other unilaterally is an essential feature of option contracts generally. *Plikerd v. Mongeluzzo*, 596 N.E.2d 601, 606 (Ohio Ct. App. 1992) ("An option is a unilateral contract, since it binds one side without binding the other; and the binding effect of an option given for a consideration does not depend on mutuality. So it prevents the party who signs it from disposing of the property under consideration until its expiration. But the party having the option is of course not bound to exercise it; he can withdraw from it at any time prior to the exercise thereof." (quoting 17 Ohio Jurisprudence 3d (1980) 453–455, Contracts, Section 22)); *see generally* Arthur L. Corbin, *Option Contracts*, 23 Yale L. J. 641 (1914). Accordingly, if Chesapeake had exercised its option to "renew" (as opposed to its option to "extend"), it could have unilaterally bound the Easthams to a new lease altogether, provided that the new lease was "under similar terms."

For these reasons, we reject the Easthams' ambiguity arguments. Having concluded that the lease is unambiguous, we decline to address the Easthams' extrinsic evidence of the parties' intent. *Shifrin,* 597 N.E.2d at 501.

B.

Next, the Easthams argue that, because the lease specified that Chesapeake's option would only be effective "[u]pon expiration of this lease and within sixty days thereafter," Chesapeake was required to let the original lease expire before it could exercise its option. In other words, the Easthams argue that Chesapeake's exercise of its option to extend the lease was premature, because Chesapeake exercised its option approximately one month before the original lease expired. We disagree.

As the district court noted, the Easthams have not cited any authority or a case where an option under a contract was invalidated because the option was exercised early (as opposed to on time or late). Nor were we able to locate such a case. Moreover, as noted above, under Ohio law, "extend" and "renew" have distinct meanings. As Chesapeake points out, construing the

sixty-day provision of the lease as the Easthams do would effectively read the word "extend" out of the contract. Under the Easthams' interpretation of the sixty-day provision, Chesapeake would *never* be able to exercise its option to extend the lease: if it exercised its option to extend the lease before the expiration of the original lease, it would be premature—if it waited until after the original lease's expiration, it would have waited too long. Accordingly, we reject the Easthams' timeliness argument.

Second, even assuming, arguendo, that the sixty-day provision created a condition precedent, we would not conclude that the condition's failure to occur created cause to excuse the Easthams from being bound under the new lease. In general, "[t]he nonoccurrence of a condition precedent excuses a party from performing the duty promised under the contract." *Evans, Mechwart, Hambleton & Tilton, Inc. v. Triad Architects, Ltd.*, 965 N.E.2d 1007, 1013 (Ohio Ct. App. 2011).

> However, if the condition is of only minor importance, its happening is a mere technicality, and a forfeiture will result by insisting on its occurrence, the nonoccurrence as a result of impossibility or impracticability will be excused, and the duty that was subject to the condition's occurrence will become absolute despite its failure to occur. The failure of the condition to occur will not operate to discharge that party's further duty of performance.

14 Williston on Contracts § 43:14 (4th ed.). Here, the early filing of the extension was nonmaterial; we thus decline to release the Easthams from their obligations under the lease on this basis.

C.

The Easthams next argue that public policy counsels in favor of not interpreting the lease as the district court did. The Easthams argue that the lease is "grossly unfair" both to them and others who signed similar contracts, who are generally uneducated as to the nuances of the law. The Easthams argue that the language of the lease is predatory and merely a tool of a sophisticated energy company which used complex language to "swindle" the Easthams and other similarly situated landowners at a time when demand for Midwestern oil and gas has increased dramatically.

The presumption under Ohio law is the freedom to contract. *Cincinnati City Sch. Dist. Bd. of Ed. v. Conners*, 974 N.E.2d 78, 82–83 (Ohio 2012). However, that presumption can be overcome; contracts can still be held unenforceable as against public policy. *Id*. at 83. The Easthams assert that "Ohio public policy mandates that provisions in oil and gas leases must not be construed in such a one-sided way as to place the landowner at a further disadvantage." But the Easthams offer no citation to any act of the Ohio General Assembly in support of that assertion, and, as the Ohio Supreme Court has noted, "it is the legislative branch that is the ultimate arbiter of public policy." *Id*. (citations, quotation marks, and alterations omitted). Nor do the Easthams cite any Ohio court case that would support their assertion regarding Ohio public policy (in fact, the only court case cited in support of the Easthams' public policy argument is from West Virginia). And, we were unable to locate either an act of the Ohio General Assembly or an Ohio court case that supports the Easthams' assertion with regard to Ohio's public policy about construing oil and gas leases. In short, the Easthams have not actually offered any public policy that the lease could have violated.

D.

Finally, the Easthams argue that the district court's interpretation of Paragraph 19 leads to an unconscionable result. Again, we disagree.

Unconscionability "embodies two separate concepts: (1) unfair and unreasonable contract terms, *i.e.,* 'substantive unconscionability,' and (2) individualized circumstances surrounding each of the parties to a contract such that no voluntary meeting of the minds was possible, *i.e.,* 'procedural unconscionability[.]'" *Collins v. Click Camera & Video, Inc.,* 621 N.E.2d 1294, 1299 (Ohio Ct. App. 1993). "The party asserting unconscionability of a contract bears the burden of proving that the agreement is both procedurally and substantively unconscionable." *Hayes v. Oakridge Home*, 908 N.E.2d 408, 412 (Ohio 2009).

Procedural unconscionability requires consideration of a variety of factors. Specifically:

Procedural unconscionability considers the circumstances surrounding the contracting parties' bargaining, such as the parties' age, education, intelligence, business acumen and experience, who drafted the contract, whether alterations in the printed terms were possible, and whether there were alternative sources of supply for the goods in question. Factors which may contribute to a finding of

unconscionability in the bargaining process include the following:  belief by the stronger party that there is no reasonable probability that the weaker party will fully perform the contract; knowledge of the stronger party that the weaker party will be unable to receive substantial benefits from the contract; knowledge of the stronger party that the weaker party is unable reasonably to protect his interests by reason of physical or mental infirmities, ignorance, illiteracy or inability to understand the language of the agreement, or similar factors.

*Taylor Bldg. Corp. of Am. v. Benfield,* 884 N.E.2d 12, 22–23 (Ohio 2008) (citations, quotation marks, and alterations omitted).

As for substantive unconscionability:

An assessment of whether a contract is substantively unconscionable involves consideration of the terms of the agreement and whether they are commercially reasonable.  Factors courts have considered in evaluating whether a contract is substantively unconscionable include the fairness of the terms, the charge for the service rendered, the standard in the industry, and the ability to accurately predict the extent of future liability.  No bright-line set of factors for determining substantive unconscionability has been adopted by [Ohio courts].  The factors to be considered vary with the content of the agreement at issue.

*Hayes,* 908 N.E.2d at 414 (citations omitted).

The Easthams have failed to meet their burden to establish either procedural or substantive unconscionability.  Regarding procedural unconscionability, they argue that the lease was procedurally unconscionable because neither William nor Frostie is well-educated (and in fact William is illiterate) and the lease is an unclear adhesion contract.  Although William's illiteracy could be a basis for procedural unconscionability, William testified that he could have had someone read the contract to him; he simply chose not to do so.  And, the mere failure to read a contract does not make the contract procedurally unreasonable. *See ABM Farms, Inc. v. Woods,* 692 N.E.2d 574, 579 (Ohio 1998) (citing *Upton v. Tribilcock*, 91 U.S. 45, 50 (1875)). Regarding the Easthams' claim that Paragraph 19 was a contract of adhesion (and therefore procedurally unconscionable), the Ohio Supreme Court has held that in order to establish a contract is one of adhesion, a party must show that he had no "realistic opportunity to bargain" or that he could not "obtain [the] desired product or services except by acquiescing" to the contract as written. *Sekeres v. Arbaugh*, 508 N.E.2d 941, 946 (Ohio 1987).  Indeed, the "[d]istinctive feature of [an] adhesion contract is that the weaker party has no realistic choice as to its terms."

*Id*. at 946–47.  The Easthams have not offered evidence that they had no "realistic opportunity to bargain" or that they could not have obtained a lease "except by acquiescing" to the contract as written.  For these reasons, they have failed to establish that the lease was procedurally unconscionable.

Even assuming that the Easthams had established procedural unconscionability, their unconscionability argument would still fail because they have failed to establish substantive unconscionability.  *Hayes,* 908 N.E.2d at 412 (both procedural and substantive unconscionability must be established).  The Easthams are clearly dissatisfied with the terms of the lease—they now feel they could have done better under prevailing market rates.  However, they have failed to demonstrate that the contract was commercially unreasonable, particularly in light of the fact that Frostie testified that she believed that one-eighth of the gas and oil revenue or $490 per year was "a good deal at the time."  In short, simply because the Easthams are dissatisfied with the result of the contract, it does not follow that the contract is commercially unreasonable.

IV.

For these reasons, we affirm the judgment of the district court.