RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 17a0286p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

BRIAN K. HALL; MICHAEL G. THOMPSON,

　　　　　　　　　　*Plaintiffs-Appellants*,

　　*v.*

EDGEWOOD PARTNERS INSURANCE CENTER, INC.,

　　　　　　　　　　*Defendant-Appellee*.

No. 17-3744

---

Appeal from the United States District Court for the Northern District of Ohio at Toledo.
No. 3:17-cv-00821—Jeffrey James Helmick, District Judge.

Argued:  December 6, 2017

Decided and Filed:  December 19, 2017

Before:  SILER, KETHLEDGE, and THAPAR, Circuit Judges.

---

## COUNSEL

---

**ARGUED:**  Gregory H. Wagoner, SHUMAKER, LOOP & KENDRICK, LLP, Toledo, Ohio, for Appellants.  Steven D. Pearson, COZEN O'CONNOR, Chicago, Illinois, for Appellee.  **ON BRIEF:**  Gregory H. Wagoner, Katherine S. Decker, SHUMAKER, LOOP & KENDRICK, LLP, Toledo, Ohio, for Appellants.  Steven D. Pearson, COZEN O'CONNOR, Chicago, Illinois, for Appellee.

---

## OPINION

---

　　THAPAR, Circuit Judge.  Brian Hall and Michael Thompson formed a business division that sold its clients and their goodwill to another company.  The buyer kept them on as employees.  And in return, Hall and Thompson agreed not to solicit their old clients if they were terminated.  But Hall and Thompson broke their promise.  When they asked the district court to

let them out of the deal, the district court refused, entering a preliminary injunction prohibiting them from soliciting old clients.  They now appeal that injunction.

I.

The equipment rental insurance industry is built on clients and their goodwill.  Clients are assets, and "assets in the insurance world are everything."  R. 57, Pg. ID 1669.  Hall and Thompson have built a significant client base in their careers as brokers of equipment rental insurance.  Early in their careers, they brought some of their clients to a specialty division they formed at Hylant Group.  The division was successful—so much so that another company, USI Insurance Services, sought to acquire its assets.

USI agreed to pay a substantial sum for the division's assets and to keep Hall and Thompson on as employees to continue building their book of business.  In return, Hall and Thompson gave up any ownership interest in their old clients.  They also promised that if they were terminated, they would refrain from soliciting their old clients for two years from the date on which they were no longer employed.  And they agreed that USI could assign their employment contracts to a subsequent purchaser.

Things went south when a subsequent purchaser—Edgewood Partners Insurance Center—came into the fold.  Edgewood bought out USI's entire equipment rental insurance business, including Hall and Thompson's old clients.  But Hall and Thompson could not work out an arrangement to stay on with Edgewood.  So USI terminated them.  Upon their termination, Hall and Thompson began reaching out to their old clients.  They also turned to the courts, seeking a declaratory judgment permitting them to do so.  In response, Edgewood sought a preliminary injunction barring Hall and Thompson from breaching their non-solicitation agreements. The district court issued the injunction.  Hall and Thompson appeal that ruling.

II.

A preliminary injunction is an extraordinary remedy reserved only for cases where it is necessary to preserve the status quo until trial.  *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008); *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).  In determining

whether to issue a preliminary injunction, a district court weighs four factors: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction." *S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017) (quoting *Bays v. City of Fairborn*, 668 F.3d 814, 818–19 (6th Cir. 2012)). As long as there is some likelihood of success on the merits, these factors are to be balanced, rather than tallied. *Id.*

This court reviews the decision to enter a preliminary injunction with some deference. *Id.* Specifically, we review the district court's decision to grant an injunction for abuse of discretion. *Id.* But we review legal conclusions made in the process de novo and findings of fact for clear error. *Id.*

### III.

*Asset Purchase Agreement.* Hall and Thompson devote most of their appeal to arguing that Edgewood is unlikely to succeed on the merits. They first contend that their employment contracts were not properly assigned to Edgewood. Why? Because the Asset Purchase Agreement—the principal document by which USI acquired Hall and Thompson's clients—is assignable only with Hall's written consent. Hall did not consent in writing to USI's sale to Edgewood. And so Hall and Thompson maintain that Hall's lack of consent invalidates USI's assignment of their employment contracts, which were exhibits to the Asset Purchase Agreement.

Stepping back for a moment, an initial problem with Hall and Thompson's argument sits in plain view: Edgewood was not a party to the Asset Purchase Agreement. USI was. So if USI breached the Asset Purchase Agreement by executing the sale to Edgewood and assigning Hall and Thompson's employment contracts without Hall's consent, Hall's beef is with USI.

But Hall and Thompson's argument also suffers from a more basic flaw: Their employment contracts both had their *own* assignment provisions, separate from the one in the Asset Purchase Agreement. So even if Hall and Thompson were right that USI breached the

Asset Purchase Agreement through the sale to Edgewood, they still need to show that the assignment provision in the Asset Purchase Agreement somehow supersedes the assignment provision in their employment contracts. Ohio law guides this inquiry. *Lulaj v. Wackenhut Corp.*, 512 F.3d 760, 764 (6th Cir. 2008) (applying law of forum state in diversity action where there was no dispute as to choice of law); *see also* R. 20, Pg. ID 409 (specifying that the Asset Purchase Agreement "shall be governed by, and construed under, the laws of the State of Ohio").

Ohio law instructs that contracts be interpreted to give effect to the parties' intent. *Eastham v. Chesapeake Appalachia, L.L.C.*, 754 F.3d 356, 361 (6th Cir. 2014) (quoting *Sunoco, Inc. (R&M) v. Toledo Edison Co.*, 953 N.E.2d 285, 292 (Ohio 2011)). To discern the parties' intent, courts look to the plain and ordinary meaning of the language used in their agreement. *Id.* And—as is key here—courts "give reasonable effect to every provision in the agreement." *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 763 (6th Cir. 2008) (quoting *Stone v. Nat'l City Bank*, 665 N.E.2d 746, 752 (Ohio Ct. App. 1995)).

Here, the only way to give reasonable effect to every provision of the parties' agreement is to apply the Asset Purchase Agreement's assignment language to the Asset Purchase Agreement and the employment contracts' assignment language to the employment contracts. Hall and Thompson fail to rebut the presumption that this plain-meaning interpretation is what they intended. After all, the Asset Purchase Agreement required that Hall and Thompson agree to their employment contracts as a condition of closing the sale. And the employment contracts repeatedly refer back to the Asset Purchase Agreement. So when Hall and Thompson negotiated their employment contracts with USI, they would have known the assignment language in the contracts differed from that in the Asset Purchase Agreement. We therefore must give effect to that differing language. *Savedoff*, 524 F.3d at 763. To do otherwise would render it a nullity.

Hall and Thompson attempt to sidestep this common-sense conclusion by pointing to an integration clause in the Asset Purchase Agreement that states that the employment contracts are part of the parties' agreement. But this is just an integration clause; it does not supersede the employment contracts' assignment language. *Coal Res., Inc. v. Gulf & W. Indus., Inc.*, 756 F.2d 443, 447 (6th Cir. 1985) ("The purpose of an integration clause . . . [is] to prevent either party from relying upon statements or representations made during negotiations that were not included

in the final agreement."). Indeed, the Asset Purchase Agreement's assignment restrictions apply only to the "Agreement" itself. R. 20, Pg. ID 410. And the Asset Purchase Agreement defines "Agreement" as the Asset Purchase Agreement. *Id.* at Pg. ID 386.

Moreover, it would make very little sense for USI to allow Hall to veto its ability to transfer Hall and Thompson's employment contracts to a subsequent buyer. In USI's view, its power to stop Hall and Thompson from stealing back clients was as valuable as the clients themselves. USI would no doubt want the option to transfer this power on resale. And if Hall were to withhold his consent to USI transferring that power, it would deprive USI of the benefit of its bargain. Surely that is not what the parties intended.

In a footnote in their opening brief, Hall and Thompson further argue that the assignment to Edgewood was invalid because their employment negotiations with Edgewood had already failed at the time of assignment. But whatever the merits of this argument, Hall and Thompson forfeited it by failing to raise it before the district court. *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 552 (6th Cir. 2008). We therefore decline to address it.

*Termination Without Cause*. Hall and Thompson next claim that even if USI properly assigned the employment contracts to Edgewood, those contracts' non-solicitation provisions are unenforceable. They say that, under the law governing their contracts (New York law), an employer cannot enforce a restrictive covenant against an employee terminated without cause. They cite *Post v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 397 N.E.2d 358 (N.Y. 1979), for this proposition. But *Post* did not establish that restrictive covenants are only enforceable against employees terminated for cause. Rather, *Post* addressed the "narrow issue" of whether an employer can "forfeit pension benefits earned by an employee who competes with the employer after being involuntarily discharged." *Id.* at 359. *Post*, therefore, is about a specific type of restrictive covenant: one penalizing the violator of a non-compete provision by stripping him of a post-employment benefit. Neither USI nor Edgewood forced Hall or Thompson to forfeit post-employment benefits here.

Granted, some courts have read *Post* to establish a per se rule that restrictive covenants are unenforceable against employees terminated without cause. But as New York's highest court

has explained, *Post* establishes no such rule. *Morris v. Schroder Capital Mgmt. Int'l*, 859 N.E.2d 503, 506 (N.Y. 2006) (describing *Post* as applying to "cases where an employer conditions receipt of postemployment benefits upon compliance with a restrictive covenant"). Similarly, the Second Circuit has stated that *Post* does not hold that restrictive covenants are per se unenforceable against an employee terminated without cause. *Hyde v. KLS Prof'l Advisors Grp., LLC*, 500 F. App'x 24, 26 (2d Cir. 2012) (per curiam); *see also Morris v. Schroder Capital Mgmt. Int'l*, 481 F.3d 86, 88 (2d Cir. 2007) (per curiam) (explaining *Post*'s limited relevance). In short, *Post* does not bar Edgewood from enforcing the non-solicitation provisions.

*Thompson's Old Clients.* Thompson alone argues that Edgewood is unlikely to succeed on the merits against him because he is free to solicit his old clients under *BDO Seidman v. Hirshberg*, 712 N.E.2d 1220 (N.Y. 1999). There, an accountant joined BDO when his firm and BDO merged. *Id.* at 1221. Like Thompson, the accountant agreed that if he was terminated, he would not solicit BDO's clients for a period of time. *Id.* But when BDO sought to enforce the agreement, the court concluded that the agreement was overbroad. Specifically, the court held that BDO could not bar the accountant from servicing clients who came to the firm "only as a result of [the accountant's] own independent recruitment efforts, which BDO neither subsidized nor otherwise financially supported as part of a program of client development." *Id.* at 1225. "Because the goodwill of those clients was not acquired through the expenditure of BDO's resources," the court found that BDO had no legitimate interest in barring the accountant from dealing with them. *Id.*

Thompson likens himself to the accountant in *BDO*. But they are not entirely alike. Thompson developed certain client relationships during his employment with Hylant and USI. Thus, Hylant and USI may have "subsidized [and] otherwise financially supported" the recruitment of at least some of Thompson's clients "through the expenditure of [their] resources." *Id.* at 1225. *BDO*, therefore, is inapposite as to those clients.

On the other hand, Thompson has identified certain clients with which he formed relationships without any financial contribution from Hylant or USI. Edgewood has no legitimate interest in barring Thompson from soliciting clients "who came to [Hylant and USI] solely to avail themselves of [Thompson's] services and only as a result of his own independent

recruitment efforts." *Id.* at 1225. As to these clients, therefore, Edgewood cannot enforce Thompson's non-solicitation agreement.

The district court failed to distinguish between those clients Thompson recruited with the benefit of Hylant's and USI's resources and those he recruited solely on his own accord. Edgewood has no likelihood of success on the merits as to the latter camp. We therefore reverse the district court's ruling with respect to those clients. *See S. Glazer's Distribs.*, 860 F.3d at 849 (observing that a preliminary injunction cannot issue without the movant demonstrating some likelihood of success on the merits). On remand, the district court should make factual findings as to which of Thompson's clients he recruited and developed solely on his own accord, and which clients Hylant and USI expended their own resources in recruiting and developing. It should modify the preliminary injunction to exclude clients that Thompson recruited and developed solely on his own.

In all other respects, however, the district court correctly concluded that Edgewood is likely to succeed on the merits.

IV.

Hall and Thompson also challenge the remainder of the district court's preliminary-injunction analysis. First, they claim that the district court erred in concluding that Edgewood would suffer irreparable harm absent the injunction. But this court has held that loss of customer goodwill and fair competition resulting from breach of a restrictive covenant constitutes irreparable harm. *Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992); *accord Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 550 (6th Cir. 2007). Although lost profits alone are calculable and compensable through monetary damages, loss of goodwill is not. *Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264, 279 (6th Cir. 2015) (answering the argument that "lost profits are fairly easily calculated and remedied through damages" by pointing out that corresponding "harm [to] goodwill and competitive position . . . would be hard to compensate"). Thus, it may be clear what Edgewood paid for Hall and Thompson's clients and what percentage of profits those clients might currently represent. But it is impossible to know what additional business those clients and their goodwill might

generate. The district court did not err, therefore, in finding that Edgewood was likely to be irreparably harmed.

Nor did the district court err in weighing harm to others or in considering what would serve the public interest. The district court acknowledged that Hall, Thompson, and their clients might suffer some harm because of the injunction, but concluded that this harm was insufficiently weighty to preclude entry of the injunction. Given Edgewood's strong likelihood of success on the merits and the irreparable harm it is likely to suffer absent the injunction, the district court did not abuse its discretion. *See Brake Parts, Inc. v. Lewis*, 443 F. App'x 27, 33 (6th Cir. 2011) (affirming district court's decision to grant preliminary injunction despite harm to non-movant where other factors weighed in favor of issuance); *see also FirstEnergy Sols. Corp. v. Flerick*, 521 F. App'x 521, 529 (6th Cir. 2013) (discounting harm to businessman who knowingly agreed to restrictive covenant and observing that enforcing such covenants, where lawful, is "always" in the public interest (quoting *Nat'l Interstate Ins. Co. v. Perro*, 934 F. Supp. 883, 891 (N.D. Ohio 1996))).

\* \* \*

We **AFFIRM** in part, **REVERSE** in part, and **REMAND** for further proceedings consistent with this opinion.