RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 24a0122p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

HIGUCHI INTERNATIONAL CORPORATION DBA
HIGUCHI MANUFACTURING AMERICA; HIGUCHI
MANUFACTURING MEXICO S. DE R.L. DE C.V.,

                *Plaintiffs-Appellants*,

    *v.*

AUTOLIV ASP, INC.,

                *Defendant-Appellee*.

> No. 23-1752

───────────────

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:23-cv-11869—Paul D. Borman, District Judge.

Argued: May 1, 2024

Decided and Filed: May 23, 2024[*]

Before: COLE, CLAY, and THAPAR, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Stephen J. van Stempvoort, MILLER JOHNSON, Grand Rapids, Michigan, for Appellants. Jason D. Killips, BROOKS WILKINS SHARKEY & TURCO, Birmingham, Michigan, for Appellee. **ON BRIEF:** Stephen J. van Stempvoort, Todd A. Holleman, Brandon S. Corcoran, MILLER JOHNSON, Grand Rapids, Michigan, for Appellants. Jason D. Killips, Michael R. Turco, Christopher R. Struble, BROOKS WILKINS SHARKEY & TURCO, Birmingham, Michigan, for Appellee.

───────────────

[*]This decision was originally filed as an unpublished opinion on May 23, 2024. The court has now designated the opinion for publication.

---

**OPINION**

---

CLAY, Circuit Judge.    Plaintiffs Higuchi International Corporation and Higuchi Manufacturing Mexico S. de R.L. de C.V. (collectively, "Higuchi") appeal the district court's grant of a preliminary injunction to Defendant Autoliv ASP, Inc. ("Autoliv").  Higuchi, an automotive parts supplier, brought this declaratory judgment action against Autoliv, seeking a declaration that it was not obligated to supply automotive parts to Autoliv because the parties lacked an enforceable requirements contract.  Autoliv thereafter filed a breach of contract counterclaim and moved for a preliminary injunction to direct Higuchi to supply automotive parts pending the resolution of the parties' suit.  The district court granted Autoliv's motion for a preliminary injunction.  For the reasons set forth below, we **REVERSE** the district court's order and **REMAND** for further proceedings consistent with this opinion.

## I. BACKGROUND

Higuchi is an automotive parts supplier that for some time has sold seatbelt parts to Autoliv, which manufacturers seatbelt safety systems for car companies.  Autoliv has purchased these parts from Higuchi by way of "purchase orders" and "releases."  The purchase orders, which Autoliv sends to Higuchi, list certain general information such as the price per unit and tariff numbers for the parts Autoliv desires to purchase.  After sending a purchase order, Autoliv later issues releases to Higuchi, which request to buy specific quantities of Higuchi's automotive parts.

As relevant here, Autoliv's purchase orders begin with a section, titled "Statement of Work," which reads:

> This blanket contract is issued to cover Autoliv ASP, Inc.'s requirements of the parts listed below, for the period beginning [on the date on which the operative purchase order was issued] and ending upon the termination of the vehicle platform, including service part requirements, for which the parts listed herein are used.  Deliveries shall be made only in the quantities and at the time specified in such requirements.  Autoliv ASP, Inc. shall reserve the right to change, from time-to-time, the quantities specified in any part requirement.  In such event

> Autoliv ASP, Inc. shall be under no obligation to [Higuchi] unless the delivery or fabrication of such parts or the acquisition of such raw materials was specifically authorized in a Release delivered to [Higuchi] from Autoliv ASP, Inc[.]

*See, e.g.*, Purchase Orders, R. 14-3, Page ID #340.[1]

For a number of years, Autoliv has purchased automotive parts from Higuchi in this manner. However, over time, the parties' relationship has deteriorated. From 2021 until the onset of this lawsuit in 2023, Higuchi informed Autoliv multiple times of its intent to stop selling automotive parts to Autoliv unless Autoliv agreed to increased prices. Autoliv protested this outcome, claiming its purchase orders bound Higuchi to supply automotive parts for a set time: until "the termination of the vehicle platform" for which Autoliv makes seatbelt safety systems. *See id.* Although Autoliv ultimately agreed to price increases, it reserved its right to challenge Higuchi's actions.

Beginning in February 2022, the parties attempted to mediate their dispute, but mediation was unsuccessful. In August 2023, Higuchi brought the instant suit, seeking a declaratory judgment that it was "not required to accept additional releases" from Autoliv for the purchase of specific quantities of automotive parts and that it could "allow its contractual obligations [with Autoliv] to expire after fulfilling the last release that it accepted." Am. Compl., R. 3, Page ID #45. Higuchi then filed an expedited motion for a declaratory judgment, *see* Fed. R. Civ. P. 57, seeking an accelerated resolution of the parties' dispute. Thereafter, Autoliv filed a counterclaim for breach of contract and moved for a preliminary injunction to compel Higuchi to supply automotive parts to Autoliv until the parties' lawsuit concluded.

The district court granted Autoliv's motion for a preliminary injunction. It directed Higuchi to continue supplying automotive parts to Autoliv "without interruption" and "at the prices the parties agreed to . . . before August 2, 2023." Op. and Order, R. 23, Page ID #563 (citations omitted). Based on its grant of a preliminary injunction to Autoliv, the district court

---

[1]Although this lawsuit involves multiple purchase orders, the terms of each purchase order are identical, except for the date on which the purchase order was issued. Autoliv periodically issued new purchase orders to Higuchi to reflect routine adjustments to Higuchi's pricing, and each subsequent purchase order superseded earlier purchase orders.

denied Higuchi's expedited motion for a declaratory judgment and dismissed Higuchi's complaint with prejudice.

Higuchi timely appealed and challenges the grant of a preliminary injunction to Autoliv on appeal.

## II.  DISCUSSION

The issuance of a preliminary injunction is the exception, rather than the rule.  *See Hall v. Edgewood Partners Ins. Ctr., Inc.*, 878 F.3d 524, 526 (6th Cir. 2017).  It is typically "an extraordinary remedy reserved only for cases where [a preliminary injunction] is necessary to preserve the status quo until trial."  *Id.*; *see also Munaf v. Geren*, 553 U.S. 674, 689–90 (2008).  The weight of four factors must support the grant of a motion for a preliminary injunction:  (1) whether the movant is likely to succeed on the merits of the lawsuit, (2) whether the movant is likely to suffer irreparable harm without the injunction, (3) whether the balance of equities tips in favor of the movant, and (4) whether the injunction is in the public's interest. *Online Merchs. Guild v. Cameron*, 995 F.3d 540, 546 (6th Cir. 2021).  The first factor—whether the movant is likely to succeed on the merits—is generally the most important one.  *Sunless, Inc. v. Palm Beach Tan, Inc.*, 33 F.4th 866, 871 (6th Cir. 2022).  If a movant is highly unlikely to succeed on the merits, there is little reason for a court to take the drastic step of enjoining the opposing party at the onset of a suit.  *See id.*

We review the ultimate decision to grant a preliminary injunction for an abuse of discretion.  *Stryker Emp. Co., LLC v. Abbas*, 60 F.4th 372, 380 (6th Cir. 2023).  However, we review the district court's legal conclusions *de novo* and its factual findings for clear error.  *Id.* Because the likelihood of success on the merits is a question of law, the legal conclusion that a movant is likely to succeed on the merits is reviewed *de novo*.  *Sunless*, 33 F.4th at 868.

### A.

We begin, and largely end, with the first factor of the preliminary injunction analysis: whether Autoliv is likely to succeed on the merits.  *See Cameron*, 995 F.3d at 546.  Applying this factor to Higuchi's declaratory judgment claim and Autoliv's breach of contract counterclaim,

Autoliv must show that it is likely that (1) the parties have an enforceable contract, (2) Higuchi breached the contract, and (3) the breach caused Autoliv to suffer damages. *See Bank of Am., NA v. First Am. Title Ins. Co.*, 878 N.W.2d 816, 829 (Mich. 2016). Although "federal law defines the district court's power to issue a preliminary injunction," we evaluate Autoliv's likelihood of success on the merits of this lawsuit as a matter of Michigan law. *See Stryker*, 60 F.4th at 382. As a federal court sitting in diversity, we apply the substantive law of the applicable forum state, and it is undisputed that Michigan law governs the substance of the parties' contractual dispute. *See Fox v. Amazon.com, Inc.*, 930 F.3d 415, 422 (6th Cir. 2019). In following Michigan law, we must treat decisions of the Michigan Supreme Court as binding and anticipate how it would rule on the issues before us. *See Bear Stearns Gov't Secs., Inc. v. Dow Corning Corp.*, 419 F.3d 543, 549 (6th Cir. 2005).

The sole merits issue raised by the parties is whether there is an enforceable contract under which Higuchi is required to fulfill Autoliv's requests, via releases, to purchase specific quantities of automotive parts. According to Autoliv, its purchase orders formed such a contract and obligated Higuchi to fulfill Autoliv's releases "for the period . . . ending upon the termination of the vehicle platform." *See* Purchase Orders, R. 14-3, Page ID #340. Higuchi responds that Autoliv's purchase orders do not create a contract because they fail to comply with the Uniform Commercial Code's statute of frauds.

The Uniform Commercial Code's statute of frauds, which Michigan has adopted, requires certain contracts to be in writing. *See* Mich. Comp. Laws § 440.2201 (setting forth a statute of frauds for sales contracts). "The primary purpose of the statute of frauds is to protect parties from *unfounded* parol assertions of contractual obligation." *Roth Steel Prods. v. Sharon Steel Corp.*, 705 F.2d 134, 142 (6th Cir. 1983). As relevant here, the statute of frauds applies to contracts regarding the sale of goods for $1,000 or more. *See MSSC, Inc. v. Airboss Flexible Prods. Co.*, 999 N.W.2d 335, 338 (Mich. 2023) (citing Mich. Comp. Laws § 440.2201(1)).[2]

---

[2]Specifically, Michigan's statute of frauds for sales contracts provides:

Except as otherwise provided in this section, a contract for the sale of goods for the price of $1,000.00 or more is not enforceable by way of action or defense unless there is a writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his or her authorized agent or broker. A writing

The parties agree that their sales of automotive parts fall under the statute of frauds and therefore any contract governing those sales must satisfy the statute of frauds' requirements.

Higuchi specifically argues that Autoliv's purchase orders are void under the statute of frauds because they do not request a quantity of goods. Pursuant to the statute of frauds, a contract for the sale of goods can only be enforced up to "the quantity of goods shown in . . . writing." Mich. Comp. Laws § 440.2201(1). In fact, quantity is the only material term that must be in writing for a contract to satisfy the statute of frauds. *See Airboss*, 999 N.W.2d at 338; *Lorenz Supply Co. v. Am. Standard, Inc.*, 358 N.W.2d 845, 847 n.3 (Mich. 1984). Unlike quantity, other material terms may be missing from or incorrectly represented in a contract, and the contract may nonetheless be enforceable. *Airboss*, 999 N.W.2d at 338.

As the above reflects, quantity is of special importance in a contract subject to the statute of frauds. For that reason, a contract's written quantity term cannot be ambiguous—it must be precise and explicit. *See id.* at 344, 346. And, unlike other terms of a contract, a quantity term cannot be made clear through evidence beyond the written contract. *See id.* at 346 (stating that parol evidence "cannot be used to determine the existence of the quantity term"). The quantity term, on its face and as written, must therefore be clear and precise. *See id.*

The Uniform Commercial Code recognizes that quantity can be measured by (1) the number of goods to be sold, (2) "the output of the seller," or (3) "the requirements of the buyer." *See id.* at 339 (citing Mich. Comp. Laws § 440.2306(1)). Until recently, Michigan law was "muddled" regarding what counted as a clear quantity term for the purposes of the third category above, which is commonly known as a requirements contract. *Id.* at 344. In *MSSC, Inc. v. Airboss Flexible Products Co.*, the Michigan Supreme Court brought order to the doctrine. *See id.* The *Airboss* court held that a requirements contract satisfies the statute of frauds if it "dictate[s] that the buyer will obtain a set share of its total need from the seller (such as 'all requirements of the buyer')." *See id.* at 339. To supplement a requirements contract, the court

---

is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this subsection beyond the quantity of goods shown in the writing.

Mich. Comp. Laws § 440.2201(1).

observed, "the buyer will typically later issue 'releases'" for a specific number of goods. *See id.* at 340.

Insofar as a writing, such as a purchase order, refers to a buyer's "requirements" without binding the buyer to obtain any set share of those requirements from the seller, that writing does not create a requirements contract. *See id.* Instead, it permits the parties to form contractual obligations on a release-by-release basis, something the *Airboss* court called a release-by-release agreement. *See id.* A release-by-release agreement "gives both parties the freedom to allow their contractual obligations to expire in short order by either not issuing or not accepting a new release" for specific quantities of goods without establishing any long-term obligations to buy from or sell parts to one another. *Id.* (citations omitted). Like with a requirements contract, parties to a release-by-release agreement may also issue purchase orders that set forth overarching sales terms, but such purchase orders are "more appropriately thought of as an umbrella agreement that governs the terms of future contract offers," rather than as a binding contract. *Id.*

Higuchi argues that the parties have a release-by-release agreement, thereby allowing it to accept or decline Autoliv's offers to purchase parts on a release-by-release basis. In contrast, Autoliv argues that its purchase orders established a requirements contract, obligating Higuchi to fulfill Autoliv's releases until "the termination of the vehicle platform" for which Autoliv makes seatbelt safety systems. *See, e.g.*, Purchase Orders, R. 14-3, Page ID #340. To establish that the parties have a requirements contract, Autoliv must show that its purchase orders explicitly and precisely specify that "[Autoliv] will obtain a set share of its total need from [Higuchi]." *See Airboss*, 999 N.W.2d at 339. Autoliv is unlikely to make such a showing.

The first sentence of the purchase orders' Statement of Work says each purchase order "is issued to cover Autoliv ASP, Inc.'s requirements." *See, e.g.*, Purchase Orders, R. 14-3, Page ID #340. That sentence does not unambiguously obligate Autoliv to purchase its requirements from Higuchi, let alone precisely state the specific share of requirements at issue. *See Airboss*, 999 N.W.2d at 344 (noting that a requirements contract may not use "an imprecise quantity term"). It does not plainly state that Autoliv will buy a specific percentage of its requirements, "all" of its requirements, or any equivalent language, from Higuchi. *See id.* at 339, 344.

Autoliv asks us to infer that purchase orders "issued to cover [Autoliv's] requirements" oblige Autoliv to buy *any and all* requirements from Higuchi. *See, e.g.*, Purchase Orders, R. 14-3, Page ID #340. But an inferred quantity term does not satisfy the statute of frauds. *See Airboss*, 999 N.W.2d at 344, 346. Indeed, the inference Autoliv urges us to make is not the only possible reading of the above language. "Cover," as used in the Statement of Work, can mean to "[d]eal with" a topic. *See Cover*, Oxford Dictionaries Premium, https://premium.oxford dictionaries.com/us/definition/american_english/cover; *see also Cover*, Merriam-Webster Unabridged Dictionary, https://unabridged.merriam-webster.com/unabridged/cover. A possible reading of the Statement of Work's first sentence therefore is that the purchase orders are issued to deal with (e.g., to establish overarching terms for) Autoliv's subsequent needs, consistent with a release-by-release agreement. *See Airboss*, 999 N.W.2d at 340 (noting that under a release-by-release agreement, purchase orders function as "an umbrella agreement that governs the terms of future contract offers," rather than as a binding contract).

Even if this first sentence were harmless, the rest of the Statement of Work undoubtedly muddies the water. The next sentence of the Statement of Work reads, "Deliveries [by Higuchi] shall be made only in the quantities and at the time *specified in such requirements*." *See, e.g.*, Purchase Orders, R. 14-3, Page ID #340 (emphasis added). But a quantity and time cannot be specified *in* a requirement if the word "requirement" refers only to Autoliv's needs. The following sentence doubles down on this odd phrasing, stating that Autoliv can change "the quantities specified *in* any part requirement." *Id.* (emphasis added). The most plausible way to give meaning to these sentences is to conclude that the purchase orders use the word "requirements" to mean "releases." After all, a quantity and time can be specified in a document such as a release. And insofar as the purchase orders plausibly refer to releases and requirements interchangeably, the purchase orders are certainly not precise enough to establish a requirements contract. *See Airboss*, 999 N.W.2d at 344.

In fact, the purchase orders appear to shield Autoliv from liability in the event that it sources its requirements from other sellers. The purchase orders provide that Autoliv "shall be under no obligation" to Higuchi unless the delivery and fabrication of parts "was specifically authorized in a Release." *See, e.g.*, Purchase Orders, R. 14-3, Page ID #340. In other words,

Autoliv conditions its liability on the issuance of releases and limits its exposure to the goods specified therein.  Yet a central purpose of a requirements contract is to obligate the buyer to source its requirements from the seller.  *See Airboss*, 999 N.W.2d at 340–41.  Autoliv appears to circumvent this central purpose of a requirements contract by conditioning its liability on releases that need not—based on any language in the purchase orders—reflect its requirements.[3]

We have already concluded that a comparable agreement was not enforceable.  In *Advanced Plastics Corp. v. White Consolidated Industries, Inc.*, we held that purchase orders that included the phrase "Seller agrees to furnish Buyer's requirements" did not create an enforceable requirements contract.  *See Advanced Plastics Corp. v. White Consol. Indus., Inc.*, No. 93-2155, 1995 WL 19379, at \*2 (6th Cir. Jan. 18, 1995) (unpublished table decision).  We noted that the purchase orders included qualifying language that preserved the buyer's discretion to source its requirements from suppliers other than the plaintiff-seller.  We found it significant, for example, that the purchase orders said, "Seller agrees to furnish Buyer's requirements . . . *to the extent of* . . . Buyer's written instructions."  *Id.*  Given the ambiguous language regarding the buyer's obligations to the seller, we concluded that the record "convincingly demonstrate[d] that the parties did not enter into a requirements contract."  *Id.* at \*3.  The Michigan Supreme Court agreed, citing *Advanced Plastics* as an example of an agreement that did not create a requirements contract.  *See Airboss*, 999 N.W.2d at 340–41.

The first sentence of the Statement of Work parallels the language in *Advanced Plastics*.  *Compare* Purchase Orders, R. 14-3, Page ID #340 (providing that the purchase orders are "issued to cover Autoliv ASP, Inc.'s requirements"), *with Advanced Plastics*, 1995 WL 19379, at \*2 (describing the purchase orders' statement that "Seller agrees to furnish Buyer's requirements").  Neither the *Advanced Plastics* purchase orders nor Higuchi and Autoliv's purchase orders expressly state the set share of requirements the buyer must get from the seller.  *See Airboss*, 999 N.W.2d at 344.  Further like in *Advanced Plastics*, the purchase orders in this case use

---

[3]At one point, it appears that Autoliv argues that the duty of good faith and fair dealing implicit in every contract, including a requirements contract, supports the existence of a requirements contract in this case.  Insofar as Autoliv makes this argument, we find it unavailing.  While the duty of good faith and fair dealing applies once a court concludes there is a contract, that duty cannot itself create a requirements contract.  *Airboss*, 999 N.W.2d at 346.  The question we consider today—whether Higuchi and Autoliv entered into a requirements contract—is therefore a threshold question.

qualifying, ambiguous language that muddles any of Autoliv's potential obligations to buy parts from Higuchi. As discussed above, the purchase orders limit Autoliv's liability only to goods requested in releases and appear to use the words "releases" and "requirements" interchangeably. From this, we can conclude that Higuchi and Autoliv "did not enter into a requirements contract." *Advanced Plastics*, 1995 WL 19379, at *3.

Importantly, for Autoliv to succeed on the merits, it must show that the purchase orders, on their face, clearly and precisely establish the set share of its requirements that it must purchase from Higuchi. *See Airboss*, 999 N.W.2d at 344, 346. By contrast, Higuchi need only show that the purchase orders are, at the very least, ambiguous regarding the share of requirements at issue. *See id.* At first blush, that disparity in what each party must show may seem harsh. But it reflects the pivotal role quantity plays in contract law, as the *Airboss* court noted, in being the only written term required for a contract to satisfy the statute of frauds. *See id.* at 338; *see also Lorenz*, 358 N.W.2d at 847 n.3.

We are also mindful of the general principle of contract law that we must construe agreements against the drafter, and the record indicates that Autoliv unilaterally drafted the purchase orders at issue in this case. *See Klapp v. United Ins. Grp. Agency, Inc.*, 663 N.W.2d 447, 454 (Mich. 2003). Construing the purchase orders against Autoliv, and in light of quantity's importance in a written contract, the purchase orders did not create a requirements contract. Instead, Autoliv and Higuchi appear to have a release-by-release agreement. Had Autoliv wished to create a requirements contract, it could have easily drafted such a contract using clearer language.

Because the parties appear not to have formed a requirements contract, Higuchi may turn down Autoliv's requests to purchase automotive parts on a release-by-release basis. Autoliv is therefore unlikely to succeed on the merits.

**B.**

The remaining factors of the preliminary injunction analysis do not alter this conclusion. The likelihood of success on the merits is typically the most important factor of a preliminary injunction analysis, *Sunless*, 33 F.4th at 866, 871, and a "preliminary injunction issued where

there is simply no likelihood of success on the merits must be reversed . . . ." *Winnett v. Caterpillar, Inc.*, 609 F.3d 404, 408 (6th Cir. 2010) (per curiam) (quoting *Mich. State AFL-CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir. 1997)).

In any case, at least two of the remaining three factors—the public interest and the balance of equities—weigh against a preliminary injunction. The district court concluded to the contrary, but only based on its erroneous legal conclusion that the parties had an enforceable requirements contract. According to the district court, the public interest supported Autoliv given the public's interest in enforcing contracts. *See Stryker*, 60 F.4th at 386 (observing that the public interest generally favors enforcing valid contracts). However, because the purchase orders do not appear to create a contract, there is no public interest in their enforcement. *See id.* Similarly, the balance of equities is at best neutral, and does not weigh in favor of Autoliv, because Higuchi has put forth evidence that continuing to supply parts to Autoliv at the parties' previous prices will force Higuchi out of business. The district court cast aside this result, concluding it was equitable to hold Higuchi to its contractual obligations under the parties' purchase orders. Taking into account the fact that the purchase orders did not create a contract, the balance of equities does not tip in Autoliv's favor.

\* \* \* \*

The likelihood of success on the merits is generally the most important factor of a preliminary injunction analysis. *Sunless*, 33 F.4th at 866, 871. That factor weighs strongly against a preliminary injunction in this case. The district court's assessment of two of the other preliminary injunction factors—the public interest and balance of equities—depended on its conclusion that the parties' purchase orders created a valid contract. However, it is unlikely that the purchase orders created a valid contract, and correspondingly neither the public interest nor the balance of equities favors a preliminary injunction. We need not reach the remaining factor of the preliminary injunction analysis—the likelihood of irreparable harm. *See Cameron*, 995 F.3d at 546. Because at least three of four preliminary injunction factors weigh against Autoliv, the "extraordinary remedy" of a preliminary injunction is not warranted in this case. *See Hall*, 878 F.3d at 526.

## III.  CONCLUSION

For the reasons set forth above, we **REVERSE** the district court's order and **REMAND** for further proceedings consistent with this opinion.