RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 12a0044p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

TRACY BAYS; KERRIGAN SKELLY,

               *Plaintiffs-Appellants,*

      *v.*

CITY OF FAIRBORN; PETER BALES,
individually and in his official capacity as
Parks and Recreation Superintendent for the
City of Fairborn; RODNEY MYERS,
individually and in his official capacity as
Police Officer for the City of Fairborn; MARK
STANNARD, individually and in his official
capacity as Police Officer for the City of
Fairborn,

             *Defendants-Appellees.*

> No. 10-4059

Appeal from the United States District Court
for the Southern District of Ohio at Dayton.
No. 10-00283—Thomas M. Rose, District Judge.

Argued: January 13, 2012

Decided and Filed: February 13, 2012

Before: SILER and KETHLEDGE, Circuit Judges; ADAMS, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Nathan W. Kellum, ALLIANCE DEFENSE FUND, Memphis, Tennessee,
for Appellants. Joshua R. Schierloh, SURDYK, DOWD & TURNER CO., L.P.A.,
Miamisburg, Ohio, for Appellees. **ON BRIEF:** Nathan W. Kellum, Jonathan A.
Scruggs, ALLIANCE DEFENSE FUND, Memphis, Tennessee, for Appellants. Joshua
R. Schierloh, Jeffrey C. Turner, Dawn M. Frick, SURDYK, DOWD & TURNER CO.,
L.P.A., Miamisburg, Ohio, for Appellees.

_____

[*] The Honorable John R. Adams, United States District Judge for the Northern District of Ohio,
sitting by designation.

———————————

**OPINION**

———————————

SILER, Circuit Judge.  Plaintiffs Tracy Bays and Kerrigan Skelly brought this action against the City of Fairborn and various Fairborn officials (collectively "Fairborn"), claiming that the solicitation policy in effect at the Fairborn Sweet Corn Festival ("Festival") violates the free speech clause of the First Amendment.  The plaintiffs' request for a preliminary injunction was denied by the district court, which found that the plaintiffs were not likely to succeed on the merits because the solicitation policy and its enforcement were not state action, and the policy, even if it was attributable to Fairborn, was a reasonable time, place, and manner restriction on speech.  For the reasons stated below, we **REVERSE** the district court's order and **REMAND** to the district court with instructions to grant the preliminary injunction.

**I.**

The Festival is an annual event held since 1982 at Community Park, a 200-acre public park in Fairborn, Ohio.  The Festival takes place in a designated portion of Community Park and involves a sweet corn eating competition, live music, and various booths displaying and selling arts and crafts and other goods.  The Fairborn Parks and Recreation Department has entered into an "Agreement for Facility Use" with the Fairborn Arts Association ("FAA") and the Fairborn Lions Club ("Lions Club") that allows the use of the park for the Festival.  The agreement provides that the "Sweet Corn Festival is the responsibility of the FAA and Lions Club organizations" and that "[p]romotion, conduct, registration, fund raising and other festival-related issues are the responsibility of the FAA and Lions Club Organizations."  Fairborn agrees to support the Festival in a number of ways, including by raising and lowering Festival banners, providing picnic tables and bleachers, and supplying general labor at a set cost.  Community Park remains free and open to the public during the Festival.

The FAA and Lions Club accept applications for booth space for those wishing to sell merchandise, food, or arts and crafts. The application is to be submitted to the FAA prior to the Festival and requires applicants to pay between $85 and $135 for a booth. Attached to the application is a set of Terms and Conditions, which includes the solicitation policy at issue in this case. Paragraph 5 of the Terms and Conditions provides that "[t]here shall be no sales or soliciting of causes outside of the booth space."

Bays and Skelly are Christians who seek to publicly convey their religious beliefs by speaking, preaching, distributing literature, and displaying signs. They planned to meet at Community Park on August 15, 2009, to express their religious views during the Festival. Bays arrived at the park around 11:00 a.m. and began walking through the Festival speaking and carrying a 2' x 2' sandwich board sign that read "Jesus is the Way, the Truth and the Life. John 14:6" on the front and "Are you born again of the Holy Spirit?" on the back. Bays was soon approached by a Festival worker who told him to remove his sign or leave the park. After Bays asked if there was a written policy substantiating this request, the Festival worker walked away and Bays followed him to a nearby tent. When Bays repeated his question about the policy, the worker referred to a Festival policy against solicitations. Bays remained convinced of his right to speak and display signs, so he left the tent and began to distribute religious tracts while continuing to wear the sign.

Bays was then approached by Peter Bales, the Fairborn Parks and Recreation Department Superintendent, who told Bays he could not display a sign or distribute literature in the park. After Bales walked away from Bays, Bays found Skelly in the park. While the two were talking, they were approached by Bales and three Fairborn police officers, including Mark Stannard and Rodney Myers. Bays and Skelly invoked their First Amendment rights, but the officials again stated that they could not display signs or hand out literature and that they would be arrested for criminal trespassing if they did not stop those activities. Officer Myers also informed them that they would need a "permit," presumably for a booth, if they wanted to stand and preach stationary, but that they could still talk to other people as long as "people [do not] indicate to us that

you are bothering them . . . . If we start getting approached by people who say, hey these two guys are approaching me and bothering me and talking about stuff I don't want to hear, then you're going to have a problem."

After a lengthy discussion, Bays and Skelly decided to avoid arrest and leave the Festival at Community Park. They filed their complaint with the district court on July 19, 2010, seeking declaratory relief, an injunction, and nominal damages pursuant to 42 U.S.C. §§ 1983 and 1988. The district court denied their request for a preliminary injunction, concluding that the alleged policy was not Fairborn's and that there was therefore no state action. The district court went on to explain that, even if there was state action, the plaintiffs were not likely to succeed on the merits because the solicitation policy is constitutional as a reasonable time, place, and manner restriction on speech.[1]

## II.

A district court must balance four factors when considering a motion for a preliminary injunction: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction. *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007). The parties disagree over the standard of review that should apply to the district court's denial of the motion for a preliminary injunction in this case. While Fairborn argues that the district court's determination should be reviewed for an abuse of discretion, Bays and Skelly correctly assert that the standard of review is de novo.

A district court's decision regarding whether to grant a preliminary injunction–and its weighing of the four factors–is normally reviewed for an abuse of

---

[1]The district court also granted the defendants' motion for judgment on the pleadings, concluding that the FAA and Lions Club were indispensable parties to the litigation. The court subsequently granted the plaintiffs' motion for leave to file an amended complaint, and the FAA and Lions Club were added as defendants.

discretion. *Id*. at 540. In First Amendment cases, however, "'the crucial inquiry is usually whether the plaintiff has demonstrated a likelihood of success on the merits. This is so because . . . the issues of the public interest and harm to the respective parties largely depend on the constitutionality of the [state action].'" *Hamilton's Bogarts, Inc. v. Michigan*, 501 F.3d 644, 649 (6th Cir. 2007) (quoting *Nightclubs, Inc. v. City of Paducah*, 202 F.3d 884, 888 (6th Cir. 2000)); *see Cnty. Sec. Agency v. Ohio Dep't of Commerce*, 296 F.3d 477, 485 (6th Cir. 2002) ("[W]hen First Amendment rights are implicated, the factors for granting a preliminary injunction essentially collapse into a determination of whether restrictions on First Amendment rights are justified to protect competing constitutional rights."). The public interest analysis and the question of whether Bays and Skelly will suffer irreparable injury entirely depend on whether the solicitation policy and its enforcement by Fairborn are constitutional. Because the "determination of whether the movant is likely to succeed on the merits is a question of law and is accordingly reviewed de novo," *Tenke Corp.*, 511 F.3d at 541, the standard of review for a district court decision regarding a preliminary injunction with First Amendment implications is de novo. *Hamilton's Bogarts*, 501 F.3d at 649; *Cnty. Sec. Agency,* 296 F.3d at 485.

Determining the plaintiffs' likelihood of success on the merits involves two questions. The first question is whether the solicitation policy and its enforcement should be considered state action attributable to Fairborn. If there is state action, the question then becomes whether the solicitation policy is constitutional under the First Amendment.

## III.

"It is undisputed that [First Amendment] protections . . . are triggered only in the presence of state action and that a private entity acting on its own cannot deprive a citizen of First Amendment rights." *Lansing v. City of Memphis*, 202 F.3d 821, 828 (6th Cir. 2000). Fairborn argues that there is no state action in this case because the solicitation policy found in the Terms and Conditions attached to the booth application is attributable to the FAA and Lions Club, the private groups that organize the Festival,

and not to Fairborn. They further argue that the enforcement of the policy by Fairborn officials does not transform the private policy into state action.

On the question of state action, *Parks v. City of Columbus*, 395 F.3d 643 (6th Cir. 2005), is controlling. In *Parks*, similar to the Festival in Fairborn, the city of Columbus issued a permit to a private entity, the Columbus Arts Council, to hold a festival on public streets in downtown Columbus. *Parks*, 395 F.3d at 645. Parks attended the festival and wore a sign with a religious message before being told to leave by an off-duty police officer who had been hired by the Arts Council to serve as security. *Id.* at 646. As in *Parks*, the Fairborn officers in this case were dressed in their official police uniforms, identified themselves as officers, and threatened arrest. *Id.* at 652. According to *Parks*, "all of these factors combined create the presumption of state action." *Id.* Perhaps more importantly, the Fairborn officials in this case supported and enforced the solicitation policy, just as the city agents in *Parks* "supported the [private entity's] permitting scheme" challenged in that case. *Id.* at 653. In this case, Fairborn officials engaged in state action by supporting and actively enforcing the solicitation policy in place at the Festival.[2]

**IV.**

The constitutionality of the solicitation policy under the First Amendment is analyzed in three steps. *Cornelius v. NAACP Legal Def.& Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985). The first step is to determine whether Bays's and Skelly's conduct is protected speech. *Saieg v. City of Dearborn*, 641 F.3d 727, 734 (6th Cir. 2011). Displaying signs, orally disseminating religious beliefs, and distributing religious tracts

---

[2]Fairborn relies on *Reinhart v. City of Brookings*, 84 F.3d 1071 (8th Cir. 1996), for its argument that there has not been state action. In *Reinhart*, the court found that the actions of a private organization in restricting political campaigning at its art festival could not be attributed to the city, even though the festival took place in a public park. *Id. Reinhart*, however, lacked the presence of state officials who enforced the speech restriction. A more recent Eighth Circuit case, *Wickersham v. City of Columbia*, 481 F.3d 591 (8th Cir. 2007), is similar to the situation at the Festival in Fairborn. In that case, the court found state action, distinguishing *Reinhart* because the city in *Wickersham* "not only provided critical assistance in planning and operating the show, but also played an active role in enforcing the particular speech restrictions challenged in [that] action." *Wickersham*, 481 F.3d at 598. The Eighth Circuit's view of state action in *Wickersham* is therefore consistent with our decision in *Parks*, as both cases recognized that an active role of police officers or government officials in the enforcement of festival policy is sufficient to establish state action.

all fall under the purview of the First Amendment, and Fairborn does not dispute that Bays's and Skelly's conduct is protected speech. *See Boos v. Barry*, 485 U.S. 312, 318 (1988) (holding that statute restricting sign display near embassies violated First Amendment); *Murdock v. Pennsylvania*, 319 U.S. 105, 108 (1943) (holding that distribution of religious tracts is protected).

The next step, then, is to "'identify the nature of the forum, because the extent to which the Government may limit access depends on whether the forum is public or nonpublic.'" *Parks*, 395 F.3d at 647 (quoting *Cornelius*, 473 U.S. at 797). "The Supreme Court has recognized three types of public fora: the traditional public forum, the designated public forum, and the limited public forum." *Miller v. City of Cincinnati*, 622 F.3d 524, 534 (6th Cir. 2010). "'Traditional public fora are defined by the objective characteristics of the property, such as whether, by long tradition or by government fiat, the property has been devoted to assembly and debate.'" *Parks*, 395 F.3d at 648 (quoting *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677 (1998)). Public parks like Community Park are "quintessential public forums." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983) (internal quotation marks omitted); *Lowery v. Jefferson Cnty. Bd. of Educ.*, 586 F.3d 427, 432 (6th Cir. 2009).

Both parties agree that Community Park kept its status as a traditional public forum despite the existence of the Festival. Whether a municipality has the power to transform a traditional public forum into a limited or non- public forum is an open question. *See Parks,* 395 F.3d at 650 (noting that "other jurisdictions have been conflicted as to whether a city may transform a traditional public forum"). Regardless of the answer to that question, Fairborn has not transformed Community Park into a limited public forum. In *Parks*, we held that the downtown Columbus streets remained a traditional public forum, despite the fact that the private sponsors entered into an agreement with the city, organized the festival, and were required to carry liability insurance. *Id.* at 652. As with the streets in *Parks*, Community Park remains free and open to all members of the public during the Festival. *Id.* ("The City cannot . . . claim

that one's constitutionally protected rights disappear because a private party is hosting an event that remained free and open to the public.").

The third step is to apply the appropriate standard to Fairborn's speech restriction. *Saieg*, 641 F.3d at 735. Because Bays and Skelly wish to engage in protected speech in a traditional public forum, the applicable principle in this case is that reasonable "[t]ime, place, and manner restrictions may be enforced . . . so long as they are content neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *M.A.L. v. Kinsland*, 543 F.3d 841, 850 (6th Cir. 2008); *see Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984).

### A. Content Neutrality

"A major criterion for a valid time, place and manner restriction is that the restriction may not be based upon either the content or subject matter of speech." *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 648 (1981) (internal quotation marks omitted). The plaintiffs argue that the solicitation policy is content-based because its purpose is to target and silence religious expression.

"Government regulations of speech are content neutral if they are 'justified without reference to the content or viewpoint of the regulated speech.'" *Saieg*, 641 F.3d at 735 (quoting *Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez*, --- U.S. ----, 130 S. Ct. 2971, 2994 (2010)). "The government's purpose is the controlling consideration," and a restriction is content-based if it was "adopted . . . because of disagreement with the message [the speech] conveys." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

"Requiring that all [expression take place] from a stationary location is a content-neutral regulation." *Saieg*, 641 F.3d at 735. The Festival solicitation policy "applies evenhandedly to all who wish to [solicit causes]. No person or organization, whether commercial or charitable, is permitted to engage in such activities except from a booth rented for those purposes." *Heffron*, 452 U.S. at 649. There is no evidence that the

policy or Fairborn's actions were motivated by disagreement with Bays's and Skelly's religious message or by a desire to silence that message. Moreover, as in *Heffron*, Fairborn assures us that the method for allocating booth space under this policy is "a straightforward first-come, first-served system," which allays any concern that the policy "has the potential for becoming a means of suppressing a particular point of view."[3] *Id.* Finally, Bays and Skelly have no evidence that they were singled out by the Fairborn officials or that the policy was selectively enforced against them because of their religious message. For these reasons, the solicitation policy is content-neutral.

### B. Narrow Tailoring to Serve a Significant Interest

To be a constitutional time, place, and manner restriction, the solicitation policy must be narrowly tailored to serve a significant government interest. *United States v. Grace*, 461 U.S. 171, 177 (1983). The solicitation policy does not meet this standard.

Fairborn discusses several purposes of the solicitation policy that are undoubtedly legitimate government interests in certain contexts: ensuring smooth pedestrian traffic flow, increasing public safety, and relieving congestion and overcrowding. *See Heffron*, 452 U.S. at 649-50; *Cox v. New Hampshire*, 312 U.S. 569, 574 (1941) (stating that the government may "impose regulations in order to assure the safety and convenience" of those using public forums). The issue is whether these interests are significant in the context of the Festival at Community Park, and, if they are significant, whether the solicitation policy is narrowly tailored to serve those interests.

Fairborn contends that the facts in this case most closely resemble those present in *Heffron*, where the Supreme Court held that a booth requirement for the sale or distribution of any materials at the Minnesota state fair served the significant government interest of alleviating congestion and "maintain[ing] the orderly movement

---

[3]The Terms and Conditions of the booth application prohibit "[t]he display or sale of any merchandise that is illegal, undesirable, or inappropriate for a family-oriented festival" and state that "[t]he Fairborn Arts Association Committee shall have total control over the renting of all booth space." Those terms appear to reserve discretion in the festival organizers to deny permits on the basis of content, and such schemes have long been held unconstitutional. *See Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 151 (1969). Bays and Skelly were not denied a booth, however, and they have no evidence that the organizers have ever awarded booths on any basis other than first-come, first-served.

of the crowd."[4]  *Heffron*, 452 U.S. at 649-50.  Bays and Skelly, on the other hand, argue that the facts are analogous to *Saieg*, where we distinguished *Heffron* and ruled that a leafletting restriction at a festival on public city streets did not further a significant government interest, even though the city argued that the same *Heffron* interests of crowd control were being served by its regulation.  *Saieg*, 641 F.3d at 736.

"[C]onsideration of a forum's special attributes is relevant to the constitutionality of a regulation since the significance of the governmental interest must be assessed in light of the characteristic nature and function of the particular forum involved." *Heffron*, 452 U.S. at 650-51.  In *Heffron*, the forum was a 125-acre state-owned tract of land–but not a public park–that hosted the annual Minnesota State Fair, *id.* at 643, while *Saieg* involved restrictions on streets and sidewalks covering a number of city blocks that remained open to every-day pedestrian traffic during a festival.  *Saieg*, 641 F.3d at 730.

Here, there is no fence surrounding the Festival at Community Park and no admission fee to enter, as there was in *Heffron*.  And Fairborn does little to demonstrate the significance of crowd control at the Festival.  Although it consistently argues reduced congestion and smooth traffic flow as the purposes behind the solicitation policy, Fairborn "must do more . . . than 'assert interests that are important in the abstract.'" *Saieg*, 641 F.3d at 737 (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994)) (internal alterations omitted).  The *Heffron* Court was persuaded that Minnesota's interests were substantial in part because "the fairgrounds comprise[d] a relatively small area of 125 acres," which was filled with 1,400 exhibitors and well over 100,000 daily visitors.  *Heffron*, 452 U.S. at 650, 643. Fairborn has not pointed to any specific space or crowd concerns at the Festival.

These factors and the analysis in *Saieg* suggest that the interests espoused by Fairborn may not be significant enough to justify these speech restrictions in this particular forum.  Even assuming Fairborn does have a significant interest in crowd

---

[4]Fairborn also relies on *Spingola v. Village of Granville*, 39 F. App'x 978 (6th Cir. 2002), which applied *Heffron*'s holding to a speech restriction in a two-block fair on public streets.  However, in the context of the narrow tailoring analysis discussed below, the restriction in *Spingola* is readily distinguishable from Fairborn's solicitation policy.

control and smooth traffic flow, however, the solicitation policy is unconstitutional because it is not narrowly tailored to further those interests. To be narrowly tailored, a restriction on speech must not "burden substantially more speech than is necessary to further the government's legitimate interests." *Ward*, 491 U.S. at 799. Although a regulation "may satisfy the tailoring requirement even though it is not the least restrictive or least intrusive means of serving the [state's] goal," *Hill v. Colorado*, 530 U.S. 703, 726 (2000), it must not be "substantially broader than necessary." *Ward*, 491 U.S. at 800.

The scope of the Festival solicitation policy, which prohibits sales or soliciting of causes outside of booth space, is "substantially broader than necessary." *Id.* On its face, the policy prohibits any solicitation of causes, including displaying signs, distributing literature or leafletting, and one-on-one conversations, if those conversations are motivated by a desire to solicit certain causes, such as the plaintiffs' religious message. Fairborn claims in its brief that the solicitation policy does not prohibit "one-on-one discussions" outside of booths, but instead only restricts sign display, leafletting, and "stationary preaching." This interpretation is inconsistent with the plain language of the policy, which does not distinguish between solicitation by conversation and solicitation by "stationary preaching," and inconsistent with Fairborn's previous position. In discussing the purposes of the policy in its opposition to the preliminary injunction motion, Fairborn claimed that Bays's and Skelly's "soliciting efforts include one-on-one discussions" and that, absent the solicitation policy, "[s]uch discussions will effectively slow the foot-traffic among the patrons, thereby causing increased levels of congestion at the Festival." *See Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 397 (1988) ("[The court] will not rewrite a state law to conform it to constitutional requirements.").

The incident between the plaintiffs and Fairborn officials at the Festival also supports a broad interpretation that includes the prohibition of one-on-one conversations. In Bays's account, which has not been disputed by Fairborn, officer Myers stated that the plaintiffs were "probably ok" to talk to other people as long as "people [do not]

indicate to us that you are bothering them . . . . If we start getting approached by people who say, hey these two guys are approaching me and bothering me and talking about stuff I don't want to hear, then you're going to have a problem." Rather than sanctioning one-on-one conversations, as Fairborn claims, this comment actually supports the idea that Bays and Skelly were prohibited from engaging in their religious discussions. The Fairborn officials claimed that one-on-one conversations may be acceptable, so long as the plaintiffs did not bother anyone or talk about things festival goers did not want to hear (such as a religious message). The Supreme Court has made clear that an individual's speech is protected even if it does "not meet standards of acceptability" from the potential audience's view. *See Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971); *see also Berger v. City of Seattle*, 569 F.3d 1029, 1054 (9th Cir. 2009) ("[W]e cannot countenance the view that individuals who choose to enter [parks], for whatever reason, are to be protected from speech and ideas those individuals find disagreeable, uncomfortable, or annoying.").

Fairborn does not explain how the solicitation policy is necessary to serve their interests in crowd control. In invalidating a ban on leafletting and sign display on the sidewalks in front of the Supreme Court for lack of narrow tailoring, the Court stated that "[t]here is no suggestion . . . that appellees' activities in any way obstructed the sidewalks or access to the Building, threatened injury to any person or property, or in any way interfered with the orderly administration of the building . . . . A total ban on that conduct is [not] necessary." *Grace*, 461 U.S. at 182; *see Ward*, 491 U.S. at 800 n.7 ("[A] complete ban on handbilling would be substantially broader than necessary to achieve the interests justifying it."). To be sure, the Festival does offer booths for those wishing to distribute literature and display signs, so in that sense the solicitation policy is not a total ban on those activities. However, in *Saieg*, the Sixth Circuit invalidated a festival's leafletting restriction due to lack of narrow tailoring, even though potential speakers could obtain a booth and information table in another area. *Saieg*, 641 F.3d at 738-40. The court concluded that, as here, "mere speculation about danger is not an adequate basis on which to justify a restriction of speech." *Id.* at 739 (internal quotation marks and alterations ommitted); *see Turner Broad. Sys., Inc.*, 512 U.S. at 664 (requiring

that the government "demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way"). *Saieg* struck down a policy that simply restricted leafletting without an information table, while Fairborn's policy is substantially broader and includes sign display and any other solicitation of causes.

The overbreadth of the solicitation policy is clear when compared to the restrictions upheld in the cases cited by Fairborn. In *Heffron*, the state fair rule only prohibited the distribution of materials and did "not prevent organizational representatives from walking about the fairgrounds and communicating the organization's views with fair patrons in face-to-face discussions" or displaying signs. *Heffron*, 452 U.S. at 643-44, 655 ("[Speakers] may mingle with the crowd and orally propogate their views."). In *Spingola*, the upheld policy merely restricted "public speaking *designed to gather crowds*" outside a designated public speaking area. *Spingola*, 39 F. App'x at 979 (emphasis added). In fact, the speech restriction in *Spingola* was previously distinguished by *Parks v. Finan*, 385 F.3d 694, 705 (6th Cir. 2004), because of its specificity. The court stated that the *Spingola* ordinance

> was specific in the expressive activity that was isolated–"public speaking designed to gather crowds"–activity that, so tailored, had a direct impact on the village's interest in crowd control. In contrast, the [speech restriction here], extending as it does to the mere wearing of a sign and handing out of leaflets, cannot be considered narrowly tailored to the [government's] interests.

*Finan*, 385 F.3d at 705. Fairborn's policy, which prohibits all "solicitation of causes" outside of booths, including sign display, leafletting, and discussions, without regard to whether that speaking is designed to gather crowds, is much broader than the restrictions in *Heffron* or *Spingola*. Therefore, even if Fairborn could demonstrate significant interests served by the policy, the solicitation policy fails to meet the requirements for a reasonable time, place, and manner restriction because it is not narrowly tailored to serve those interests.

### C. *Ample Alternative Channels of Communication*

"The requirements for a time, place, and manner restriction are conjunctive," so it is unnecessary to reach the issue of whether Fairborn has left open ample alternative channels of communication. *Saieg*, 641 F.3d at 740. The solicitation policy is unconstitutional because it is not narrowly tailored to serve a significant government interest.

### V.

As explained above, "the issues of the public interest and harm to the respective parties largely depend on the constitutionality of the" solicitation policy. *Hamilton's Bogarts,* 501 F.3d at 649 (internal quotation marks ommitted). "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Moreover, "if the plaintiff shows a substantial likelihood that the challenged law is unconstitutional, no substantial harm to others can be said to inhere its enjoinment." *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville and Davidson Cnty.*, 274 F.3d 377, 400 (6th Cir. 2001). Finally, "'it is always in the public interest to prevent violation of a party's constitutional rights.'" *Id.* (quoting *G & V Lounge, Inc. v. Michigan Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994)). Therefore, because Bays and Skelly have shown a strong likelihood of success on the merits due to the presence of state action and the fact that the solicitation policy is not narrowly tailored to serve a significant government interest, the other factors weigh in the plaintiffs' favor and counsel for the granting of the preliminary injunction.

**REVERSED** and **REMANDED** with instructions to grant the preliminary injunction.