FILED
08/05/2020
Clerk of the
Appellate Courts

IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE
July 30, 2020 Session

**EARLE J. FISHER ET AL. v. TRE HARGETT ET AL.**

**Appeal by Permission from the
Chancery Court for Davidson County
No. 20-0435-III     Ellen Hobbs Lyle, Chancellor**

———————————————————

**No. M2020-00831-SC-RDM-CV**

—————————————————————

**BENJAMIN LAY ET AL. v. MARK GOINS ET AL.**

**Appeal by Permission from the
Chancery Court for Davidson County
No. 20-0453-III     Ellen Hobbs Lyle, Chancellor**

———————————————————

**No. M2020-00832-SC-RDM-CV**

———————————————————

SHARON G. LEE, J., concurring in part and dissenting in part.

Under the majority's decision, qualified Tennessee voters can now vote by absentee mail ballot if voters, in their discretion, determine they have underlying medical or health conditions that make them more susceptible to contracting COVID-19 or if they are vulnerable to greater health risks should they contract COVID-19, or if they care for someone with such a condition.[1] I concur in part because I welcome this result as to those

---

[1] The Defendants' interpretation of Tennessee Code Annotated section 2-6-201(5)(C) (2014 & Supp. 2019) has changed significantly since this case began. Under the April 23, 2020 Tennessee Election COVID-19 Contingency Plan, only persons who tested positive for COVID-19 and anyone quarantined because of a potential exposure to COVID-19 could vote absentee. Fear of becoming ill or of spreading COVID-19 was not sufficient. But at oral argument in this Court, the Defendants' attorney made a surprising concession that

plaintiffs, and I agree with much of what the majority has to say about the rest. This cascade of agreement includes: the presumption of constitutionality afforded to Tennessee Code Annotated sections 2-6-201(5)(C) and (D); the application of the *Anderson-Burdick* standard of review; the moderate burden on the right to vote of those plaintiffs who do not have (or care for someone with) an underlying condition; and the lack of persuasiveness of the Defendants' evidence of voter fraud. And yet I must dissent.

This ruling does not go far enough. *All* qualified Tennessee voters—like voters in forty-five other states—should be allowed to apply to vote by absentee mail ballot during the unprecedented and deadly COVID-19 pandemic that is gripping our community, state,[2] nation,[3] and world.[4]

These plaintiffs who do not have an underlying health condition or are not vulnerable to greater health risks or do not provide care for someone with a health condition ("the Plaintiffs") can only vote in person or not at all under the Defendants' interpretation of Tennessee Code Annotated section 2-6-201(5)(C) and (D). The issue before us is *not* whether the Defendants' interpretation of section 2-6-201(5)(C) and (D) violates the Plaintiffs' right to vote. Rather, the narrow issue in this expedited interlocutory appeal is whether the trial court abused its discretion by issuing a temporary injunction preventing the Defendants from enforcing their interpretation of the eligibility requirements for absentee voting under section 2-6-201(5)(C) and (D) and requiring the Defendants to provide any eligible voter who applies to vote by mail to avoid transmission or contraction

---

if a voter who is otherwise eligible . . . has an underlying condition [that makes them vulnerable to COVID-19, and] . . . they have made the determination that [this] condition . . . based upon their health history [and other factors including "measures" taken "to reduce the risk of exposure"] prevents them from appearing at the polling place on Election Day, then . . . they can submit an application for an absentee ballot. And presuming that they meet all the other requirements and [that] the application is appropriate, then they are entitled to vote an absentee-by-mail ballot.

[2] As of August 5, 2020, there are 114,098 cases of and 1,144 deaths from COVID-19 in Tennessee. Tenn. Dep't of Health, *Tennessee COVID-19 Unified Command Dashboard*, https://experience.arcgis.com/experience/885e479b688b4750837ba1d291b85aed (last visited Aug. 5, 2020).

[3] As of August 5, 2020, there are 4,748,806 cases of and 156,311 deaths from COVID-19 in the United States. Ctrs. for Disease Control & Prevention, *Coronavirus Disease 2019 (COVID-19)*, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited Aug. 5, 2020).

[4] As of August 5, 2020, there are 18,614,542 cases of and 702,330 deaths from COVID-19 in the world. Johns Hopkins Coronavirus Res. Ctr., *COVID-19 Dashboard*, https://coronavirus.jhu.edu/map.html (last visited Aug. 5, 2020).

of COVID-19 an absentee ballot.[5] In other words, the narrow issue in this appeal is whether in issuing the stay and the injunction, the trial court applied an incorrect legal standard, reached an illogical or unreasonable decision, or based its decision on a clearly erroneous assessment of the evidence. *See Funk v. Scripps Media, Inc.*, 570 S.W.3d 205, 210 (Tenn. 2019) (quoting *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010)). Our standard of review of a trial court's discretionary decision is deferential. We neither second-guess the trial court nor substitute our judgment for the trial court's. *Harmon v. Hickman Cmty. Healthcare Servs., Inc.*, 594 S.W.3d 297, 305 (Tenn. 2020) (quoting *Lee Med.*, 312 S.W.3d at 524).

In deciding to issue the temporary injunction, the trial court had to consider whether (1) the Plaintiffs had "a strong likelihood of success on the merits," (2) the Plaintiffs "would suffer irreparable injury absent the injunction," (3) "the injunction would cause substantial harm to others," and (4) issuing the injunction would serve "the public interest." *Daunt v. Benson*, 956 F.3d 396, 406 (6th Cir. 2020) (quoting *Bays v. City of Fairborn*, 668 F.3d 814, 818–19 (6th Cir. 2012) (listing the factors)); *see also Vintage Health Res., Inc. v. Guiangan*, 309 S.W.3d 448, 467 (Tenn. Ct. App. 2009).

When the fundamental right to vote is at stake, the primary question is whether a plaintiff has shown a likelihood of success on the merits. This is because "issues of the public interest and harm to the respective parties largely depend on the constitutionality of the [state action]." *Daunt*, 956 F.3d at 406 (alteration in original) (quoting *Bays*, 668 F.3d at 819). Thus, the determinative question here is whether the Plaintiffs have shown a *likelihood* of success on the merits of their claim that the Defendants have violated the Plaintiffs' constitutionally protected right to vote.

In determining the likelihood of success on the merits, we apply the federal courts' *Anderson-Burdick* standard. Under this standard, when voters claim their right to vote has been or is being denied, the first step is to examine "the burden the [s]tate's regulation imposes on the right to vote." *Mays v. LaRose*, 951 F.3d 775, 784 (6th Cir. 2020) (citing *Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Obama for Am. v. Husted*, 697 F.3d 423, 428 (6th Cir. 2012)). A "severe" burden is presumptively invalid; the state must prove it surpasses heightened scrutiny. *See Daunt*, 956 F.3d at 407 (quoting *Burdick*, 504 U.S. at 434). A "minimal" burden survives unless the challengers can show it is not rationally

---

[5] In their briefs, the Defendants assert that the injunction is too broad for an as-applied challenge and that the Plaintiffs have not satisfied the heightened requirements for a facial challenge. But the injunction does not broadly invalidate Tennessee Code Annotated section 2-6-201's eligibility criteria. Instead, it compels the Defendants to permit absentee voting for citizens in identical circumstances as "the particular litigant"—indeed, "under the facts of the instant case." *Hughes v. Tenn. Bd. of Prob. & Parole*, 514 S.W.3d 707, 712 (Tenn. 2017) (quoting *State v. Crank*, 468 S.W.3d 15, 24 n.5 (Tenn. 2015)). Namely, they are required to vote in person during the pandemic in order to vote at all, burdening that right. This is hardly a set of "hypothetical facts in other situations," *id.*; it is limited to the particular circumstances of a rare pandemic.

related to a legitimate purpose. *See id*. There are cases finding a "moderate" burden that fall between these extremes. *See Mays*, 951 F.3d at 784. If we determine that the state has imposed a moderate burden on the right to vote, the next step is to weigh the burden imposed on the plaintiffs against the state's asserted interest and its way to achieve that interest. *Daunt*, 956 F.3d at 407 (quoting *Ohio Democratic Party v. Husted*, 834 F.3d 620, 627 (6th Cir. 2016)). The burden of proof shifts between the parties in a manner that is familiar from other legal domains, such as antitrust law's "rule of reason" and employment discrimination law.[6]

Under the *Anderson-Burdick* standard, the Plaintiffs must make an initial showing that the Defendants moderately burdened the Plaintiffs' right to vote. The Plaintiffs did not need to show that they were prohibited from voting, but only that they had "few alternate means of access to the ballot." *Obama for Am.*, 697 F.3d at 431 (quoting *Citizens for Legislative Choice v. Miller*, 144 F.3d 916, 921 (6th Cir. 1998)).

Here, the Plaintiffs established through the statements of Dr. Arthur Reingold, Dr. Sandra Arnold, Dr. James Gurney, Dr. Michael Threlkeld, and Dr. Jeffrey Steven Warren that if the Defendants do not allow the Plaintiffs to vote absentee, then because of COVID-19, they have no alternative means to vote. Dr. Reingold, one of the nation's foremost epidemiology experts at the cutting edge of research on COVID-19, credibly testified that "[a]ll people are susceptible to and capable of getting COVID-19 because of the ease with which it spreads." Reingold Declaration, IX Lay TR 1200. According to Dr. Reingold, individuals in close contact can transmit and inhale droplets containing the virus by touching one's face after touching an infected surface—or even by breathing in aerosolized droplets that can float in the air for minutes at a time. *Id.* at 1200–01. Many people are silent spreaders, unwittingly infecting others even as they display no symptoms at all; as a result, "to prevent increasing the scope of the outbreak of COVID-19, we must assume that anyone could be infected and transmit infection to others." *Id.* at 1202. Because any physical interaction with another person or surfaces that the person has touched could carry a viral load, there are ineliminable risks to requiring in-person voting. So long as voters must gather in the same space—lining up, entering and exiting, interacting with polling workers, signing the rolls, operating the machines, and the like—everyone is at risk. *Id.* at 1204–05.

Even though the Defendants' contingency plan includes several measures to mitigate the risk of spread, the Plaintiffs' medical experts reviewed the plan and testified that these measures were inadequate to contain the virus. *See* Arnold Declaration, III Fisher

---

[6] *See* Samuel Issacharoff, *Voter Welfare: An Emerging Rule of Reason in Voting Rights Law*, 92 Ind. L.J. 299 (2016) (comparing the rule of reason in antitrust law to the Sixth Circuit's flexible and dynamic approach to *Anderson-Burdick*); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973) (developing a burden-shifting test in antidiscrimination law).

TR 319; Gurney Declaration, III Fisher TR 362; Threlkeld Declaration, III Fisher TR 387; Warren Declaration, III Fisher TR 392. Dr. Gurney explained:

> [T]he choice at hand is whether a citizen who fears becoming infected by this highly contagious virus is able to vote from the safety of his or her home or is forced to venture out to a public polling place where voters will not be required to wear masks and where lines will form and social distancing will be very difficult to enforce.

Gurney Supp. Declaration, VI Fisher TR 845–46.

According to the Plaintiffs' proof, the only reliable way to prevent the spread of the disease is to eliminate interpersonal interaction wherever possible. This is why the official recommendations of the Centers for Disease Control and Prevention ("CDC") for conducting this fall's elections instruct governments to "minimize direct contact" between people, including through means such as voting by mail. X Lay TR 1355. The CDC also recommends the use of face coverings such as cloth masks. *Id.* at 1359. Mask mandates fall within the state's police powers according to the Tennessee Attorney General. *See Constitutionality of Governmental Mandate to Wear Face Coverings*, Op. Tenn. Att'y Gen. No. 20-14 (July 24, 2020). And yet the Defendants' Contingency Plan merely "encourages" but does not require voters to wear masks. Transcript of Proceedings from June 3, 2020, XVIII Lay TR 2534, 2560.

Thus, the Plaintiffs have established that requiring them to vote in person moderately burdens their fundamental right to vote.[7] The trial court's decision that this burden was more than minimal was not illogical or unreasonable and was not based on a clearly erroneous reading of the evidence. In short, the trial court did not abuse its discretion.

The second step of the analysis shifts the burden of proof to the Defendants and requires them to justify the infringement on the Plaintiffs' right to vote. *See, e.g.*, *Mays*, 951 F.3d at 791 (citing *Obama for Am.*, 697 F.3d at 433–34). In considering the Defendants' evidence, we weigh the "character and magnitude of the asserted injury"

---

[7] The Defendants cite *Thompson v. Dewine* for the proposition that courts "cannot hold private citizens' decisions to stay home for their own safety against the State." 959 F.3d 804, 810 (6th Cir. 2020). According to the Defendants, the fault lies with the pandemic, not at their feet. But they cannot so easily disclaim the state's responsibilities. The fulcrum for *Anderson-Burdick* analysis is *not* the state law or regulation; it is the *burden on the right to vote*. Of course, state action figures into the analysis: the core of the test is to assess the fit between an alleged burden and the state's proffered justification. But that all comes later. There is no principled reason to build a state-action requirement into the baseline that *determines the extent of the burden in the first place*. If a policy in effect on Day 1 stays in effect through Day 2, but the circumstances on Day 2 change so that the policy now burdens the right to vote, then that is all the test needs in order to proceed. We test the Defendants' proffered justification against the alleged burden. The Defendants' cry of "But *I* didn't *do* anything!" makes no difference. And in fact—as it is here—that may be the problem.

against the "precise interests put forward by [the Defendants] . . . taking into consideration the extent to which those interests make it *necessary* to burden the plaintiff's rights." *Obama for Am.*, 697 F.3d at 433 (quoting *Burdick*, 504 U.S. at 434). Thus, the Defendants had to establish that exposing would-be voters to a deadly pandemic was necessary to advance an important objective and that their actions were appropriately tailored to that end.

The Defendants attempt to meet their burden of proof by advancing several related interests: the feasibility and fiscal impact of increasing absentee voting, as well as the specter of voter fraud. In simple terms, the Defendants' first argument is that allowing the Plaintiffs to vote absentee would bust the budget and invite chaos. To support this contention, the Tennessee Coordinator of Elections, Mark Goins, has estimated the amount of additional resources needed to process the influx of absentee ballots, depending on different projections. Typically, less than 3% of registered voters submit an absentee ballot. Yet the Defendants' contingency plan assumes that every single voter who is statutorily eligible to vote absentee will request a ballot, preparing for 33% of registered voters to vote absentee. Goins Declaration, XI Lay TR 1537–38. The tab for this expansion is covered by a "significant portion" of the nearly $10 million in federal stimulus money that Tennessee received for election costs. *Id.* at 1538. Under the injunction, the Defendants imagine that *100%* of all eligible registered voters will vote by absentee ballot in the August and November elections—even though never in the state's history has this occurred. The Defendants' predictions of bedlam and financial ruin are predicated on the testimony of five county election administrators (Jeff Roberts of Davidson, XI Lay TR 1628–32; Linda Phillips of Shelby, *id.* at 1634–37; Chris Davis of Knox, *id.* at 1639–42; Tim Sweat of Morgan, XII Lay TR 1644–46; and Annette Pulley of Houston, *id.* at 1648–51) who crunched the numbers based on that projection. The Defendants offered no credible evidence as to why in the midst of a pandemic every single voter in Tennessee who is eligible to vote by absentee ballot would request an absentee ballot, vote, and then return the ballot. The Defendants' evidence to support the financial costs of allowing additional voters to vote absentee is just not credible.

The Defendants also rely on the testimony of Kim Wyman, the Secretary of State of Washington. She estimates, based on her knowledge of Washington's conversion to an all vote-by-mail state, that it would take Tennessee years to do the same. "Based on our experiences in Washington, it would be extremely difficult for Tennessee to switch to by-mail voting for the November elections, and impossible to switch to by-mail voting for the August elections, without it resulting in total chaos and comprising [sic] the integrity of the elections." Wyman Declaration, XII Lay TR 1663. But this testimony misses the mark. Tennessee is not changing to a system where everyone votes by mail, and a ballot is mailed to every voter. Again, the Defendants failed to submit credible evidence to support their position.

The Defendants' argument that every single voter who is eligible to vote absentee will do so is undermined by history (it has never happened before) and the difficulty that a voter faces in voting absentee. Ballots are not just automatically mailed to would-be voters. Instead, a qualified Tennessee voter must first request a ballot by submitting a signed written request detailing information including the voter's name, address, social security number, birthday, and the statutory reason for absentee voting. The voter can obtain a ballot request form by downloading it from the Secretary of State's website, printing it, filling it out, and signing it.[8] The voter must then go to a *different* website, correctly identify his or her local election commission office, and mail, fax, or e-mail it there. Once the ballot is received, the voter must fill it out and return it by mail; hand delivery to the local election commission office is prohibited. In short, the voter must make a concerted effort to vote absentee; most of the public materials explaining how to vote absentee presume access to a computer and a printer. Anyone other than an employee of an election commission who "gives an application for an absentee ballot to any person" commits a felony. Tenn. Code Ann. § 2-6-202(c)(3) (2014 and Supp. 2019). Merely giving "an unsolicited request for application for absentee ballot to any person" risks a Class A misdemeanor. *Id*. § 202(c)(4).

The Defendants express concern over the crushing workload that will be caused by increased voter participation in absentee voting. Yet the Defendants have been under this injunction for two months, already having carried out the absentee component of this week's primary election. The Defendants have filed no Tennessee Rule of Appellate Procedure 14 motion for consideration of post-judgment facts to report any logistical nightmares that had somehow come to pass while escaping public view. All we know is that the number of absentee votes ticked up,[9] and yet the republic still stands.

In *Mays*, the Sixth Circuit held that the state's interest in the orderly administration of the election was "important and weighty enough to overcome the moderate burden" of a three-day deadline for plaintiffs confined in a jail to request an absentee ballot. 951 F.3d at 791. But that conclusion depended on crucial facts established in *Mays* that are not in evidence here. Ohio demonstrated a concrete trade-off for election officials to spend their scarce resources—most of all, in the weekend before an election, *time*—on last-minute absentee ballot requests in lieu of an array of other pressing duties. *Id*. at 787–88. Importantly, what sat on the other side of the ledger were *also* vital measures to effectuate the right to vote.

But here, the Defendants' predictions of chaos rest on dubious assumptions that serve only to excuse inaction. As the trial court observed, the Defendants' fevered speculation that 100% of eligible voters would vote absentee at a 100% turnout rate may

---

[8] Tenn. Sec'y of State, *How Do I Request an Absentee Ballot?*, https://sos.tn.gov/products/elections/how-do-i-request-absentee-ballot (last visited Aug. 4, 2020).

[9] *See infra* notes 10–12 and accompanying text.

be more driven by a desire to be "overprepared," *see* Contingency Plan, III Lay TR 284 and XI Lay TR 1535–40, than it is informed by past experience, XV Lay TR 2091–92 (tabulating past turnout). The Defendants' expert witness Secretary Wyman conceded that this assumption sits well outside the range of the reasonable. XIII Lay TR 1917. When pressed by the trial court, the Defendants' counsel offered little further to defend their position. *See* Transcript of Proceedings from June 3, 2020, XVII Lay TR 2492–2502.

The total turnout in November 2016 was 62% of registered voters; in November 2018, the turnout was 54%.[10] The window for absentee voting in the August elections has already closed, and the Secretary of State has tracked the number of votes that have come in.[11] The Secretary of State's website does not disaggregate the data for early and absentee voting, so we cannot know exactly how many people voted absentee under the injunction. But we do know that it was much less than all voters—absentee and early voters together added up to about 578,000, or roughly *only* 14% of all registered voters.[12] This was a modest increase, and in at least nine counties (Haywood, Wayne, Monroe, Perry, Overton, Lake, Hancock, Scott, and Clay) the number of early and absentee voters *decreased* from 2016.[13]

And unlike in *Mays*, there is no pressing time constraint here. Assuming a risk of delay in tabulating the results, the desire for punctuality or the need for public patience does not outweigh even a moderate burden on the right to vote.

To the extent that the Defendants' asserted interest is *purely* fiscal, burdening the Plaintiffs' right to vote by denying them access to an absentee ballot in this pandemic—to any ballot at all—is not properly tailored. First, it is difficult to assess exactly how many additional resources will be necessary as a result of the injunction. The Defendants, who had the burden of proof, offered no direct evidence on this point—only the assertions and

---

[10] Tenn. Sec'y of State, *Statistical Analysis of Voter Turnout for the November 8, 2016 Election as Submitted by the Counties*, https://sos-tn-gov-files.s3.amazonaws.com/2016_November_PPP_Turnout.pdf (last visited Aug. 4, 2020); Tenn. Sec'y of State, *Statistical Analysis of Voter Turnout for the November 6, 2018 Election as Submitted by the Counties*, https://sos-tn-gov-files.tnsosfiles.com/2018%20November.pdf (last visited Aug. 4, 2020).

[11] Tenn. Sec'y of State, *2020 vs. 2016 through 14 Days – All Voters by County*, https://sos-tn-gov-files.tnsosfiles.com/August%202020%20-%20All.pdf?01d105W34SF4muRgCFrdacMR7BJ8VhO8 (last visited Aug. 4, 2020).

[12] *Id.* The estimate of total registered voters for this simple calculation comes from the most recent data from the office of the Tennessee Secretary of State, about 4,073,000 as of December 2019. *See* Election Statistics, Voter Registration, December 2019, Tennessee Secretary of State, https://sos.tn.gov/products/elections/election-statistics (last visited Aug. 4, 2020).

[13] Tenn. Sec'y of State, *2020 vs. 2016 through 14 Days – All Voters by County*, https://sos-tn-gov-files.tnsosfiles.com/August%202020%20-%20All.pdf?01d105W34SF4muRgCFrdacMR7BJ8VhO8 (last visited Aug. 4, 2020).

assumptions already discussed. We are not able to "guesstimate" this amount from the Defendants' evidence. *See* Memorandum and Order Granting Temporary Injunction, XV Lay TR 2121–25. Second, even though the Defendants surely face difficult trade-offs as budgets come under strain during an economic crisis, the initial item on the chopping block *cannot* be a fundamental constitutional right. The right to vote is a constitutional mandate—every bit as much as the purity of the ballot box that the Defendants espouse—and a statutory entitlement. The introductory provision of the absentee ballot chapter insists that "[t]he purpose of this chapter is to provide a means for qualified voters to cast their votes when they would otherwise be unable to vote," Tenn. Code Ann. § 2-6-101(a) (2014), and the purpose of the title is similarly to conduct elections "so that . . . [m]aximum participation by all citizens in the electoral process is encouraged." Tenn. Code Ann. § 2-1-102(4) (2014).

The Defendants also worry about "leakage" or undercounting absentee ballots because of voter error. But the trial court was right in finding that "[i]t is for the individual, not the State, to weigh the risk of not filling out the absentee ballot correctly and their vote not being counted, versus exposing themselves to the polling place during the pandemic." Memorandum and Order Denying Stay and Granting Interlocutory Appeal, XVIII Lay TR 2629. Possessing the right to vote means the freedom to make that determination for oneself.

Finally, a pivotal consideration in upholding the absentee deadline in *Mays* was that the state of Ohio had already gone further than the vast majority of its peers in opening access to the ballot. The *Mays* court discounted the burden on the right "given the alternative voting opportunities that Ohio provides." 951 F.3d at 786. "Ironically, it is [Ohio's] willingness to go further than many States in extending the absentee voting privileges" that opened it up to the plaintiffs' equal protection claim. *Id.* at 791 (alteration in original) (quoting *McDonald v. Bd. of Election Comm'rs of Chicago*, 394 U.S. 802, 810 (1969)).

But here, the consideration of the Defendants' efforts to open access to the ballot points entirely in the opposite direction. As the trial court aptly put it, "unlike the can-do approach" of forty-seven states with vote-by-mail or absentee measures, eleven of which adopted them as an emergency response to this pandemic, Tennessee has simply thrown up its hands. Like the Sixth Circuit, I

> fail to see the merit in wearing blinders. While comparisons with the laws and experience of other states may not be determinative of a challenged law's constitutionality, to ignore such information as irrelevant is to needlessly forfeit a potentially valuable tool . . . and deny reality: courts routinely examine the burden resulting from a state's regulation with the experience of its neighboring states.

*Ohio Democratic Party*, 834 F.3d at 629 (citations omitted). This insight holds true for assessing the difficulties a state confronts as much as it does the imposition on voters. And here, the experience of all but three sister states belies the Defendants' arguments. States enjoy a wide latitude in administering their elections, but that choice cannot arbitrarily deprive the right to vote. Any infringement must be justified, and here it is not. The Defendants failed to carry their burden of proof.

The Defendants' other asserted interest to justify this deprivation is the prevention of voter fraud. We have credited this interest as important in weighing the balance of election regulations, *City of Memphis v. Hargett*, 414 S.W.3d 88, 103 (Tenn. 2013), because once again, the value of an "election[]" that is "free and equal" sits on both sides of the scale. Tenn. Const. art. I, § 5. And yes, the Defendants may plan ahead to prevent fraud. But, again, this interest must be properly tailored to the alleged burden. The means must fit the end, and here, they do not. The Defendants' election expert, Secretary Wyman, has publicly stated that concerns about fraud should not dissuade states from extending absentee voting by mail in this pandemic. *See* Kim Wyman, Opinion, *Republican Leader: My State Shows Why Voting by Mail Is Secure and Trustworthy*, USA Today (May 15, 2020), available at https://www.usatoday.com/story/opinion/2020/05/15/amid-coronavirus-washington-state-shows-why-vote-mail-secure-column/5189588002/. When the trial court pressed the Defendants' counsel on this contradiction and complete lack of evidence, his response was to suggest that Tennessee may prophylactically prevent fraud— a non sequitur—and to pivot to its other argument that Tennessee is "being asked to turn on a dime," which has been addressed. *See* XVIII Lay TR 2538–40.

Additionally, the means of depriving voters access to absentee ballots are not properly tailored to the state's interest. As we observed in *City of Memphis*, the constitutional means "to avoid potential fraud in an absentee ballot" is that "voters must strictly comply with an entirely different set of procedural safeguards" from in-person voting, most notably "providing a signature to be compared with the voter's signature in the registration record, and signing an affidavit under penalty of perjury attesting that all information on the ballot application is correct and that the affiant meets all the necessary voting qualifications." 414 S.W.3d at 110–11 (citations omitted). The Defendants have already significantly expanded their expectations for absentee voting from less than 3% up to 33%. Forty-seven other states have gone even further. The Defendants must present evidence that these narrower means and policies already in place are inadequate, and they have no choice but to toss out absentee voting like the proverbial baby and the bathwater. The Defendants have failed to carry their burden of proof.

It comes down to the Defendants' concern that if qualified Tennessee voters with no underlying health conditions are allowed to submit a ballot request to vote by mail, there could be fraud. Yet, the Legislature already allows a multitude of other voters to vote absentee:

**(1) Persons Outside of County.** If the voter will be outside the county where the voter is registered during the early voting period and on election day during all the hours the polls are open for any reason other than the fact that the voter will be imprisoned;

**(2) Students and Spouses Outside of County.** If a voter is enrolled as a full-time student in an accredited college, university or similar accredited institution of learning in this state which is outside the county where the voter is registered. This provision also applies to the spouse of the student who resides with the student;

**(3) (A) Permanent Absentee Voting Register.** The county election commission shall establish a permanent absentee voting register for any person who is, because of sickness, hospitalization or physical disability unable to appear at either the commission office or at the person's polling place for the purpose of voting. To be eligible for placement on the register, a voter shall file a statement by the person's licensed physician with the county election commission stating, under the penalty of perjury, that in the physician's professional medical judgment, the patient (voter) is medically unable to appear at the polling place to vote and is medically unable to go to the commission office for the purpose of early voting. The voter shall file the physician's statement and the application not less than seven (7) days before the election. The administrator of elections shall attach the physician's statement to the voter's permanent registration record. Without any further request, the administrator shall send to each person placed on the permanent absentee voting register an application for an absentee ballot for each election in which the person may vote;

**(B) Residents of Certain Institutions.** In the case of individuals who are full-time residents of any licensed nursing home, home for the aged or similar licensed institution providing relatively permanent domiciliary care, other than a penal institution, outside the voter's county of residence, the procedure for voting shall substantially follow the provisions established in subdivision (3)(A) for voters on the permanent absentee voting register, or the voter may vote under the procedures established in subdivision (1) for voters outside of the county;

**(4) Jurors.** If an individual expects to be unable to appear during the early voting period or at the polling place on election day because the person is serving as a juror for a federal or state court;

**(5) Persons Over 60 — Persons Hospitalized, Ill or Disabled.**

**(A)** A person sixty (60) years of age or older when the person requests to vote absentee;

**(B)** The person is a voter with a disability as defined in § 2-3-109, and the voter's polling place is inaccessible;

**(C)** The person is hospitalized, ill or physically disabled, and because of such condition, the person is unable to appear at the person's polling place on election day; or

**(D)** The person is a caretaker of a hospitalized, ill or disabled person;

**(6) Candidates for Office.** Without stating any reason therefor, if the voter is a candidate for office in the election for which the voter seeks to cast an absentee ballot;

**(7) Election Officials — Election Commission Members or Employees.** If the person is an election official or a member or employee of the election commission on election day;

**(8) Observance of a Religious Holiday.** If the voter cannot appear during the early voting period or at the polling place because of observance of a religious holiday; or

**(9) Persons Possessing a Valid Commercial Driver License or Transportation Worker Identification Credential.** A voter who possesses a valid commercial driver license or a valid transportation worker identification credential and who certifies that the voter:

**(A)** Will be working outside of the county or state where the voter is registered during the early voting period and on election day during all the hours the polls are open; and

**(B)** Has no specific out-of-county or out-of-state location to which mail may be sent or received during such time;

may complete an application to vote absentee by mail at the voter's county election commission office or complete an absentee by-mail application pursuant to § 2-6-202(a)(3); provided, that if applicable, such voter satisfies the requirements of § 2-2-115(b)(7). In order for the absentee application to be processed, the voter must provide a photocopy of the commercial driver license or transportation worker identification credential, the commercial driver license number on the voter's current commercial driver license, if applicable, and provide a current residential address and a mailing address to which the ballot shall be mailed. This subdivision (9) also applies to the spouse of the person who possesses the commercial driver license.

Tenn. Code Ann. § 2-6-201 (Supp. 2019).

The Defendants offered no evidence as to why adding the Plaintiffs would tip the scale and result in an increased risk of fraudulent elections. The Defendants propose to reduce the risk of fraud by reducing the number of absentee voters in the midst of a pandemic. Voter suppression is not an acceptable plan.

The trial court determined that the Defendants' imposition on Plaintiffs' right to vote was not properly tailored to the Defendants' stated interests, nor did those

justifications outweigh that burden. In making this determination, the trial court did not apply the wrong legal standard, rely on illogical inferences, or draw any conclusions from the record that were clearly erroneous. For these reasons, the trial court did not abuse its discretion. *See Funk*, 570 S.W.3d at 210. Because the trial court did not abuse its discretion in determining that requiring the Plaintiffs to vote in person during the pandemic substantially burdens that right and that this burden is not outweighed by the Defendants' interests, it follows that the trial court did not abuse its discretion in determining that the Plaintiffs were likely to succeed on the merits of their claim under the *Anderson-Burdick* standard. *See Obama for Am.*, 697 F.3d at 431–32.

As a result, the harm that the Plaintiffs are likely to suffer also satisfies the second element in our four-part test for injunctive relief, that the harm is likely to be irreparable. "When constitutional rights are threatened or impaired, irreparable injury is presumed," especially where (as here) monetary damages cannot make the plaintiffs whole. *Obama for Am.*, 697 F.3d at 436 (citing *ACLU of Ky. v. McCreary Cnty.*, 354 F.3d 438, 445 (6th Cir. 2003)). "A restriction on the fundamental right to vote therefore constitutes irreparable injury." *Id.* (citing *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986)). Third, in light of the constitutional right at stake, the injunction does not cause any harm to other parties, such as the Defendants. The *Anderson-Burdick* test as applied by the trial court sufficiently balances those equities. Finally, "the public has a 'strong interest in exercising the fundamental political right to vote.'" *Id.* at 436–37 (quoting *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006)). Where that right has been burdened in a way that the state has failed to adequately justify, an injunction promotes that interest. The trial court did not abuse its discretion in issuing the injunction.

Overall, the majority's decision is mostly right. Applying the *Anderson-Burdick* standard results in a finding that the Defendants' limited interpretation of Tennessee Code Annotated section 2-6-201(5)(C) and (D) places a moderate burden on the Plaintiffs' right to vote; the burden then shifts to the Defendants to justify this infringement on the Plaintiffs' constitutional right to vote; and that the Defendants offered three justifications for their actions: prevention of fraud, fiscal responsibility, and feasibility. The majority is correct that the Defendants have the authority to regulate the conduct of elections, but it is not enough to rest on this conclusory statement. The Defendants had to submit evidence to justify the burden placed on the Plaintiffs' right to vote; the Defendants failed to present credible evidence. As to fraud, the majority "tend[s] to agree" that the Defendants' claims about the risk of voter fraud was not persuasive. Again, the Defendants did not offer any credible evidence, as it must, to show that the burden on the Plaintiffs' right to vote is justified by its stated interest to prevent fraud. Of course, the Defendants may act prophylactically to prevent voter fraud—so long as their actions do not violate voters' constitutional rights. The foremost policy of the State of Tennessee is the fundamental law of our Constitution. And it is our solemn judicial duty to protect fundamental rights by carefully examining the state's reasons when these rights are burdened.

In short, the State of Tennessee is in the midst of a deadly COVID-19 pandemic—with no end in sight. Tennessee has been under a state of emergency since March 12, 2020. Many rules and statutes, ranging from in-person quorum requirements for government bodies to prohibitions on take-out and delivery purchases of alcohol, are suspended because of the pandemic. Over 112,000 Tennesseans have contracted the disease; over 1,100 Tennesseans have lost their lives; and 4,900 Tennesseans are being treated in hospitals because of COVID-19.[14] COVID-19 cases are growing exponentially. Since this case was filed, the daily average of new COVID-19 cases has increased by over 600%; that figure for daily deaths has more than doubled. *See Tennessee Coronavirus Map and Case Count*, N.Y. Times (Updated Aug. 4, 2020), available at https://www.nytimes.com/interactive/2020/us/tennessee-coronavirus-cases.html. Forty percent of cases are estimated to be asymptomatic, but even these silent spreaders will each infect an estimated 2.5 additional people. Chris Ciaccia, *CDC's 'Best Estimate' is 40% COVID-19 Infections Are Asymptomatic*, Fox News (July 13, 2020), available at https://foxnews.com/science/cdc-best-estimate-40-percent-covid-19-infections-asymptomatic (last visited Aug. 4, 2020). Thus, the White House Coronavirus Task Force and the CDC advise that face coverings are "a critical tool in the fight against COVID-19 that could reduce the spread of the disease, particularly when used universally within communities." Ctrs. for Disease Control & Prevention, *CDC Calls on Americans to Wear Masks To Prevent COVID-19 Spread* (July 14, 2020) (press release citing an editorial review in the Journal of the American Medical Association), https://www.cdc.gov/media/releases/2020/p0714-americans-to-wear-masks.html.

Despite the significant increase in COVID-19 case counts, Tennessee has no statewide mask mandate. People continue to gather in enclosed places, such as bars and restaurants. School starts soon in many communities; even contact sports are allowed. *See* Tenn. Exec. Order No. 55 (July 31, 2020) at *3, https://publications.tnsosfiles.com/pub/execorders/exec-orders-lee55.pdf. COVID-19 test results are not always timely issued. There is no vaccine in sight. Tennessee is out of step with nearly every other state in the country in its response to absentee voting during this pandemic. Only three other states do not allow either voting by mail or no-excuse absentee-by-mail voting in the current pandemic.

In the midst of this pandemic and while Tennessee remains under a state of emergency, qualified Tennessee voters with no underlying medical or health conditions should not be left with the impossible choice of voting in person and risking getting COVID-19 or forfeiting their constitutionally protected right to vote. Tennessee voters deserve better.

---

[14] *See Tennessee COVID-19 Unified Command Dashboard*, *supra* note 2.

Thus, I concur in part and dissent in part.

_____
SHARON G. LEE, JUSTICE